EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| R.J. Reynolds Tobacco (CI), Co.<br><br>        Peticionarios<br><br>             v.<br><br>Francisco Vega Otero, Inc., MAPFRE PRAICO Insurance Company; MAPFRE PRAICO Corporation; y Aseguradora X<br><br>        Recurrida | Certiorari<br><br>2017 TSPR 43<br><br>197 DPR ____ |

Número del Caso: AC-2015-104

Fecha: 29 de marzo de 2017

Tribunal de Apelaciones:

    Región Judicial de San Juan

Abogados de la Parte Peticionaria:

    Lcdo. Luis Oliver Fraticelli
    Lcda. Yesika Ramos Carro

Abogados de la Parte Recurridas:

    Lcdo. Manuel Martínez Vivas
    Lcdo. Luis Palou Balsa
    Lcda. Donna Maldonado Rivera
    Lcda. Katherine Quiñones García
    Lcdo. Carlos Martínez Texidor

Materia: Derecho mercantil: Contornos del contrato mercantil de transporte terrestre. Resarcimiento permitido al amparo del Art. 281 del Código de Comercio cuando un porteador no entrega una mercancía en el mismo estado en que se encontraba al recibirla, debido a su pérdida.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

R.J. Reynolds Tobacco (CI), Co.

       Peticionarios

          v.

                       AC-2015-0104

Francisco Vega Otero, Inc., MAPFRE PRAICO Insurance Company; MAPFRE PRAICO Corporation; y Aseguradora X

       Recurrida

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 29 de marzo de 2017.

Este caso nos permite analizar los contornos legales del contrato mercantil de transporte terrestre. En específico, nos brinda la oportunidad de esclarecer qué resarcimiento permite el Art. 281 del Código de Comercio, infra, cuando un porteador no entrega una mercancía en el mismo estado en que se hallaba al recibirla debido a su pérdida.

I

Los hechos que dan inicio a este caso se remontan al 4 de agosto de 2006. En esa fecha, RJ Reynolds Tobacco, (CI) Co. (Reynolds), una empresa dedicada a la fabricación y venta de cigarrillos, contrató a Francisco Vega Otero, Inc. (FVO), una

compañía de transportación terrestre de carga, para que transportara en un vagón 900 cajas de cigarrillos desde su fábrica en Yabucoa hasta su centro de distribución en Mayagüez. FVO, a su vez, subcontrató al Sr. Jorge Padilla para trasportar la mercancía.

Esa mañana, el señor Padilla recogió las 900 cajas de cigarrillos en la fábrica de Reynolds y salió con ellas rumbo a Mayagüez. Sin embargo, poco tiempo después, el señor Padilla se comunicó con FVO e indicó que había sido objeto de un secuestro en el peaje de Caguas donde, según alegó, se detuvo para sacar dinero de un cajero automático. Asimismo, informó que el vagón con la mercancía de Reynolds fue hurtado. Horas más tarde, el vagón fue encontrado vacío.

Como resultado de la investigación que realizaron los agentes federales a raíz del incidente, se descubrió que el señor Padilla no fue objeto de secuestro sino que, en conspiración con otros individuos, fingió el incidente para apropiarse de la mercancía de Reynolds. Consecuentemente, los individuos involucrados en el hurto fueron procesados criminalmente en el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico. El señor Padilla se declaró culpable. Entre tanto, se lograron recuperar 168 de las 900 cajas de cigarrillos transportadas, pero estas caducaron mientras se mantuvieron como evidencia por instrucción de las autoridades federales.

El 3 de agosto de 2007, Reynolds presentó una demanda contra FVO, MAPFRE Praico Insurance Company y MAPFRE Praico Corporation (en conjunto, MAPFRE) para recuperar el valor mercantil de las 900 cajas de cigarrillos perdidas. Ambas codemandadas contestaron la demanda y negaron responsabilidad. FVO adujo que no era responsable, pues el sustraigo de la mercancía fue un caso fortuito o de fuerza mayor que estaba fuera de su control. Por su parte, MAPFRE arguyó que ninguna de las pólizas de seguro expedidas a favor de FVO cubre la pérdida de la mercancía en cuestión. Precisó que la póliza principal titulada *Motor Truck Cargo Coverage Form-Schedule Vehicle-All Risk* ("Motor Truck") excluye expresamente la reclamación de Reynolds, mientras que la póliza denominada *Business Protector Occurrence Excess Policy* ("Business Protector") se activa únicamente cuando se agotan los límites establecidos en la póliza principal para aquellos riesgos cubiertos.

Según surge del expediente, las partes estipularon la bifurcación de los procedimientos judiciales para atender, en primer lugar, la controversia en torno a la responsabilidad de las empresas codemandadas y, luego, el aspecto de la compensación de los daños alegados. Apéndice, pág. 576. Asimismo, las partes estipularon prácticamente todos los hechos materiales de la reclamación, así como el contenido de las pólizas en controversia. Apéndice, págs. 737-738.

Tras varios incidentes en el pleito, el Tribunal de Primera Instancia declaró ha lugar una moción de sentencia sumaria que presentó Reynolds y resolvió que FVO y Mapfre eran responsables por los daños sufridos. De esta manera, rechazó la defensa de caso fortuito de FVO al entender que no demostró la debida diligencia al escoger a su transportista. Igualmente, concluyó que, a pesar de que la póliza "Motor Truck" excluye cubierta,[1] la póliza "Business Protector" provee cubierta adicional e independiente. Ambas codemandadas solicitaron sin éxito la reconsideración de esa determinación y, posteriormente, procuraron su revisión ante el Tribunal de Apelaciones. No obstante, luego de que el foro apelativo intermedio denegara expedir el recurso de <u>certiorari</u>, ninguna de las codemandadas recurrió ante este Tribunal.

Adjudicado el asunto de la responsabilidad de manera interlocutoria, los procedimientos ante el foro primario continuaron para determinar la indemnización a la que tiene derecho Reynolds por la pérdida de su mercancía. En cuanto a este punto, MAPFRE presentó una moción de sentencia sumaria, a la que se unió FVO. En ella, arguyó que la compensación a pagar se limitaba al valor de $136,629.36 registrado como costo de producción de la

---

[1] Las partes nunca cuestionaron la determinación del Tribunal de Primera Instancia en torno a que la póliza "Motor Truck" no cubre la pérdida de la mercancía de Reynolds. Asimismo, en este recurso, Reynolds no reseña esa determinación como una errónea y su discusión sobre el alcance de la póliza "Business Protector" parte de la premisa de que la póliza "Motor Truck" no provee cubierta.

mercancía en el documento titulado "Despacho de Producto" que describió como la carta de porte. Reynolds se opuso y adujo que tenía derecho a ser compensado no solo por dicho costo, sino también por los arbitrios pagados y las ganancias dejadas de percibir, para un total de $1,410,196.09.

El 29 de agosto de 2014, el Tribunal de Primera Instancia notificó una sentencia enmendada en la cual determinó que Reynolds solo tenía derecho a ser compensado por $136,629.36, más $540,216 por los arbitrios pagados por las 732 cajas de cigarrillos que no fueron recuperadas, para una compensación total de $676,845.36. Apéndice, págs. 1901-1902. El foro primario resaltó que, según los hechos no controvertidos, Reynolds le entregó un documento titulado "Despacho de Producto" al señor Padilla y lo catalogó como la carta de porte para fines de estimar la compensación correspondiente, "toda vez que contiene una descripción de la mercancía perdida". Íd. Así, razonó que el Código de Comercio limita la compensación al valor mercantil de la mercancía declarada en la carta de porte, más los gastos que su pérdida ocasione, y enfatizó que la reclamación de Reynolds sobre las ganancias dejadas de devengar por la venta de las cajas de cigarrillos era improcedente. El 29 de agosto de 2014, el Tribunal de Primera Instancia denegó las mociones de reconsideración que las partes presentaron oportunamente.

Inconformes, todas las partes recurrieron ante el Tribunal de Apelaciones mediante tres recursos de apelación. Por un lado, MAPFRE arguyó que la póliza "Business Protector" no cubre la pérdida de la mercancía, mientras que FVO reiteró su alegación de que el hurto constituía un caso fortuito. Por su parte, Reynolds adujo que tiene derecho a ser indemnizado por el precio de venta de la mercancía, incluida la ganancia, y no meramente por su costo y los arbitrios pagados. El 10 de julio de 2015, el Tribunal de Apelaciones notificó una sentencia en la que modificó el dictamen recurrido para desestimar la reclamación contra MAPFRE y confirmó la sentencia apelada en los demás aspectos. Concluyó que la póliza "Business Protector" no cubre la pérdida de la mercancía reclamada por Reynolds, ya que es una póliza en exceso cuya función es proveer cubierta conforme a los límites de responsabilidad pactados en la póliza primaria. Apéndice, pág. 5249.

Tras solicitar infructuosamente la reconsideración del dictamen del foro apelativo intermedio, FVO y Reynolds recurrieron a este Tribunal. Por un lado, Reynolds presentó una "apelación" y señaló que el Tribunal de Apelaciones erró al determinar que la indemnización por la pérdida de su mercancía se limita a su costo y los arbitrios pagados. Por el contrario, sostuvo que a tenor con el Art. 281 del Código de Comercio, infra, tiene derecho a recibir el valor mercantil de su mercancía,

calculado a base de su precio de venta al por mayor. Además, arguyó que el foro apelativo intermedio incidió al interpretar que la póliza "Business Protector" solo se extiende a riesgos contemplados por la póliza primaria "Motor Truck". Simultáneamente, FVO presentó un recurso de certiorari y reclamó la comisión de varios errores por parte del Tribunal de Apelaciones.

El 12 de febrero de 2016, denegamos tanto el recurso de certiorari de FVO como la denominada apelación de Reynolds. Sin embargo, Reynolds solicitó reconsideración oportunamente. Así, el 29 de abril de 2016, acogimos su recurso como un certiorari y lo expedimos en reconsideración. En cambio, FVO no procuró la reconsideración de la denegatoria de su recurso. Por lo tanto, las controversias señaladas por FVO no están ante nuestra consideración. Procedemos ahora a disponer de los errores formulados por Reynolds.

II

**A.** En Puerto Rico, el negocio de seguros está investido de un alto interés público debido al papel que juega en la protección de los riesgos que amenazan la vida o el patrimonio de los ciudadanos. Natal Cruz v. Santiago Negrón, 188 DPR 564, 575 (2013). Hemos destacado, en innumerables ocasiones, que este alto interés público se desprende de la extraordinaria importancia que juegan los seguros en la estabilidad de nuestra sociedad. Véase S.L.G. Francis-Acevedo v. SIMED, 176 DPR 372 (2009).

Los seguros cumplen una función social. Su utilidad dentro del comercio es trascendental para el desarrollo económico pues atenúa el elemento inherente del riesgo en las relaciones comerciales. En este sentido, hemos reconocido que el contrato de seguro juega un papel crucial en el ámbito comercial, ya que permite a las personas y a los negocios proteger sus recursos al transferir el impacto monetario de ciertos riesgos a cambio del pago de una prima. Maderas Tratadas v. Sun All., 185 DPR 880, 897 (2012). Ante esta realidad, el negocio de seguros se convierte en uno de los principales soportes que permite amortiguar los giros violentos de incertidumbre propios del mercado, aminora sus efectos y permite un crecimiento más estable de la economía.

De ahí que esta industria haya sido reglamentada extensamente mediante la Ley Núm. 77 de 19 de junio de 1957, según enmendada, conocida como el Código de Seguros de Puerto Rico, 26 LPRA sec. 101 et seq., y esté sujeta a las disposiciones del Código Civil de manera supletoria. Natal Cruz v. Santiago Negrón, supra. En lo pertinente, el contrato de seguro se define como aquel por el que una persona se obliga a indemnizar a otra si se produce un suceso incierto previsto. Art. 1.020 del Código de Seguros, 26 LPRA sec. 102. Por lo tanto, su propósito es indemnizar y proteger al asegurado mediante el traslado del riesgo a la aseguradora si ocurre un evento

específicamente pactado en el contrato. Integrand Assurance v. CODECO et al., 185 DPR 146, 162 (2012).

La póliza configura el documento escrito donde se plasman los términos que rigen el contrato de seguro. Art. 11.140 del Código de Seguros, 26 LPRA sec. 1114(1). En otras palabras, los términos que componen el contrato de seguro están contenidos en la póliza. A la hora de interpretar las cláusulas contenidas en una póliza, el propio Código de Seguros pauta la norma que ha de regir nuestra función hermenéutica. A esos efectos, dispone que los contratos de seguro se interpretan globalmente, a base del conjunto total de sus términos y condiciones, según expuestos en la póliza y según se hayan ampliado, extendido o modificado por aditamento, endoso o solicitud adherida a la póliza y que forme parte de esta. Art. 11.250 del Código de Seguros, 26 LPRA sec. 1125. Si los términos del contrato de seguro contenidos en la póliza son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Art. 1233 del Código Civil, 31 LPRA sec. 3471. De lo anterior se deduce que en ausencia de ambigüedad, el cumplimiento con las cláusulas del contrato es obligatorio y su contenido es ley entre las partes. Integrand Assurance v. CODECO et al., supra, pág. 161. Ahora bien, los términos de un contrato se reputan claros "cuando por sí mismos son bastante lúcidos para ser entendidos en un único sentido, sin dar lugar a dudas, controversias ni

diversidad de interpretaciones y sin necesitar para su comprensión razonamientos o demostraciones susceptibles de impugnación". S.L.G. Francis-Acevedo v. SIMED, supra, pág. 387.

**B.** En este caso, el Tribunal de Primera Instancia ordenó a FVO y a MAPFRE pagar a Reynolds solidariamente la suma que determinó que correspondía como indemnización por la pérdida de la mercancía hurtada. Así, interpretó que la póliza "Business Protector" cubría la pérdida reclamada por Reynolds de manera adicional e independiente de la póliza "Motor Truck". Sin embargo, el Tribunal de Apelaciones modificó la determinación del foro primario a los únicos efectos de precisar que la póliza "Business Protector" no extendía cubierta a Reynolds. Ante este Tribunal, Reynolds reitera que el "lenguaje claro y libre de ambigüedades" de la póliza "Business Protector" comprueba que esta se extiende a riesgos no cubiertos por la póliza "Motor Truck".

Una lectura integrada de la póliza "Business Protector" demuestra lo inmeritorio que resulta la contención de Reynolds. Esta póliza se compone de su página de declaración; sus secciones sobre cobertura, defensas, personas aseguradas, límites, condiciones, definiciones; y, por último, sus respectivos endosos. Del encasillado número cinco de la página de declaración se puede colegir que se trata de una póliza en exceso sobre los límites de la póliza "Motor Truck". Esta última se

denomina allí como "Scheduled Underlying Insurance". En esa misma línea, el acápite A de la Sección I de la póliza dispone, incluidas las definiciones de los términos claves para una mejor comprensión:

> We will pay on behalf of the insured for "ultimate net loss" [the total amount of damages for which the insured is legally liable for payment of "bodily injury", "property damage", "personal injury", or "advertising injury"] in excess of the "retained limit" because of bodily injury or property damages to which this insurance applies. We will have the right to associate with the "underlying insurer" and the insured to defend against any "suit" seeking those damages. (Énfasis suplido). Apéndice, págs. 362.

Asimismo, el inciso 10 de la Sección V conviene lo siguiente:

> If other valid and collectible insurance is available to the insured for "ultimate net loss" we cover under this policy, our obligations under this policy are limited as follows:
> a. **As this insurance is excess over any other insurance** whether primary, excess, contingent or any other basis, except such insurance as is specifically purchased to apply in excess of this policy's Limit of Insurance, **we will pay only our share of the amount of "ultimate net loss", if any, that exceeds the sum of:**
>
> (1) The total **amount that all such other insurance would pay for the loss in the absence of this insurance;** and
>
> (2) The total of all deductible and self-insured amounts under this or any other insurance. (Énfasis Suplido). Apéndice, pág. 19.

De estos términos contractuales surge con claridad que la póliza "Business Protector" es una póliza en exceso que provee cubierta únicamente sobre los límites de responsabilidad establecidos en la póliza "Motor Truck".

Los términos y condiciones de la póliza vistos globalmente corroboran que la obligación de pago de MAPFRE bajo esta póliza en exceso solo surge si la póliza primaria provee cubierta para la pérdida en cuestión.

Un seguro no responde por toda gestión imaginable del asegurado. La cubierta se circunscribe a lo acordado por las partes en la póliza. Maderas Tratadas v. Sun All., supra, pág. 900. Existen seguros que operan a distintos niveles y, en este caso, la obligación de indemnizar por parte de MAPFRE, bajo la póliza "Business Protector", surge exclusivamente si la póliza "Motor Truck" cubre el evento objeto de discusión.

Es por esto que concluimos que no incidió el foro apelativo intermedio al alterar el dictamen del Tribunal de Primera Instancia sobre este asunto y eximir a MAPFRE del pago solidario de la indemnización por la pérdida de la mercancía transportada. Nuestra interpretación del contrato nos lleva a concluir que la póliza "Business Protector" cubre las reclamaciones por las que cualquier otra póliza subyacente en vigor cubriría en ausencia de ella. En específico, MAPFRE responde bajo la póliza "Business Protector" por el exceso de lo que cubre la póliza "Motor Truck" subyacente en vigor, designada en el encasillado número cinco de la página de declaración.

III

**A.** El derecho mercantil surge en torno al comercio. Este último consiste fundamentalmente en la transferencia

de un bien desde su productor al consumidor. F. Vicent Chuliá, Compendio Crítico de Derecho Mercantil, 2da ed., Barcelona, Ronda Universidad, 1986, T. II, pág. 314. Por consiguiente, junto a la compraventa y el depósito, el transporte es un instrumento fundamental en el comercio. Íd. En su acepción más básica, en el contrato de transporte una persona se obliga, a cambio de un precio, a acarrear un bien de un lugar a otro. R. Uría, Derecho Mercantil, 12ma ed., Madrid, Imprenta Aguirre, 1982, pág. 524. En términos más específicos, en este tipo de relación contractual una persona llamada porteador se compromete, mediante un precio, a realizar las operaciones necesarias para trasladar una cosa de un lugar a otro a un destinatario, bajo su propia custodia, por encargo de una persona conocida como el cargador. J. Garrigues, Curso de Derecho Mercantil, 8va ed. rev., Madrid, Imprenta Aguirre, 1983, T. II, pág. 209.

Ahora bien, como el contrato de transporte también está regulado por el Código Civil fue necesario disponer criterios para definir cuándo se está ante un contrato de transporte de naturaleza mercantil y poder sujetarlo a las disposiciones del Código de Comercio. Uría, op. cit. A esos efectos, el Art. 267 del Código de Comercio, 10 LPRA sec. 1771, reconoce que todo contrato de transporte se reputará mercantil cuando tenga por objeto el traslado de mercaderías o efectos del comercio; o cuando el porteador sea un comerciante o se dedique habitualmente a realizar

transportes para el público, independientemente de cual sea su objeto. Así, nuestro Código de Comercio, basado en las disposiciones de su equivalente español de 1885, instituye un esquema legal específico para el contrato mercantil de transporte terrestre.

Como vimos, la obligación principal del porteador consiste en entregar una mercancía a un destinatario en el lugar, dentro del plazo y bajo las condiciones contractualmente previstas. Bajo las disposiciones del Código de Comercio, el porteador en un contrato mercantil de transporte terrestre viene obligado a entregar los efectos cargados en el mismo estado en que los recibió. Art. 281 del Código de Comercio, 10 LPRA sec. 1785. De esta manera, el porteador no se compromete solamente a prestar un servicio, sino a conseguir el resultado que busca la otra parte al concertar este tipo de contrato. Uría, op. cit., pág. 525. Además, junto a la obligación de trasladar la mercancía, el porteador asume una obligación de custodia cuyo incumplimiento ocasiona la aplicación de un riguroso régimen de riesgo. Véase Morales Mejías v. Met. & Ware. Co., 86 DPR 3 (1962).

Ese sistema de riesgo condiciona la responsabilidad legal del porteador entre los supuestos de pérdida, avería y retraso de las cosas transportadas. Uría, op. cit., pág. 534; Vicent Chuliá, op. cit., pág. 332. Hay pérdida no solo cuando la mercancía perece sino en cualquier otro caso en que el porteador no puede entregarla

efectivamente, incluido el hurto o el extravío. Garrigues, op. cit., pág. 226. La responsabilidad por caso de pérdida en el contrato mercantil de transporte terrestre se hará con atención a lo dispuesto en el Art. 281 del Código de Comercio, supra. Este dispone, en lo pertinente:

> Fuera de los casos… [en los que los daños y menoscabos que experimenten los géneros durante el transporte sean por caso fortuito, fuerza mayor o naturaleza y vicio propio de las cosas], el porteador estará obligado a entregar los efectos cargados en el mismo estado en que, según la carta de porte, se hallaban al tiempo de recibirlos, sin detrimento ni menoscabo alguno, y **no haciéndolo, a pagar el valor que tuvieren los no entregados, en el punto donde debieran serlo y en la época en que correspondía hacer su entrega**. (Énfasis suplido).

La segunda controversia que trae Reynolds ante nuestra consideración es una de estricto derecho y se circunscribe a interpretar a qué se refiere este artículo cuando requiere del porteador "pagar el valor que tuvieren los no entregados, en el punto donde deberían serlo y en la época en que correspondía hacer su entrega". Íd. Todas las partes están contestes con que la relación contractual entre FVO y Reynolds es una mercantil de transporte terrestre sujeta a las disposiciones de nuestro Código de Comercio.

En nuestro ejercicio de interpretar los artículos del Código de Comercio aplicables a esta controversia, estamos impedidos de mirar el ordenamiento jurídico actual del contrato mercantil de transporte terrestre en las jurisdicciones que han moldeado nuestro acervo legal. Por un lado, aunque el Art. 281 de nuestro Código de Comercio,

supra, es idéntico al antiguo Art. 363 del Código de Comercio de España, ese cuerpo legal fue derogado en 2009, pues "no estaba en condiciones de dar respuesta a las muy cambiantes necesidades del transporte actual" por su "anacronismo y desfase". Ley 15/2009, de 11 de noviembre (RCL 2009, 2166). De hecho, se reconoció en el preámbulo de la nueva ley española del contrato de transporte de mercancías que los preceptos del Código de Comercio continuaban en vigor sin modificaciones desde su promulgación en 1885 y "rara vez eran objeto de aplicación". Íd. Por otro lado, en Estados Unidos varias jurisdicciones estatales han adoptado las normas del Art. 2 del *Uniform Commercial Code* (UCC) para lidiar con este tipo de controversia y las restantes acuden a su tradición legal de derecho común. Por consiguiente, nuestra función hermenéutica está circunscrita a examinar las breves expresiones del Tribunal Supremo de España y el pensar de los tratadistas españoles que analizaron el Art. 363 de su Código de Comercio de 1885.[2]

Al analizar el Art. 363 del Código de Comercio español de 1885, el tratadista Joaquín Garrigues explica la limitación de responsabilidad sobre el porteador de la siguiente forma:

---

[2] "El tiempo transcurrido y los importantes cambios acontecidos desde que el Real Decreto de 28 de enero de 1886 hizo extensivo a Puerto Rico 'el Código de Comercio vigente en la Península' hacen aconsejable una revisión a fondo de este Código". F. Sánchez Calero, Anteproyecto al Código de Comercio para Puerto Rico, Revista de la Academia Puertorriqueña de Jurisprudencia y Legislación, 2008, Vol. VII, pág. 1.

Nuestro C. de c. ha vuelto al criterio de la culpa en cuanto al origen de la responsabilidad; pero ha mantenido la limitación de esa responsabilidad[…]. Se manifiesta aquí nuevamente la tendencia del Código a liquidar con rapidez las relaciones entre cargados y porteador, de acuerdo con la tendencia general del Derecho mercantil a despersonalizar estas relaciones.

El interés personal del perjudicado exigiría en cada caso concreto una suma de conceptos acreedores que, muchas veces, excedería notablemente del valor real de la mercancía. (Ejemplo: la llegada con retraso de una pieza de maquinaria impide el montaje de ésta y la paralización de la fábrica ocasiona un lucro cesante de cuantía enormemente superior al valor de aquella pieza transportada). Para evitar ese complicado cálculo y los posibles abusos del perjudicado, nuestro C. de c. no indemniza la pérdida sufrida en concreto, ni la ganancia dejada de obtener (interés subjetivo del perjudicado), sino tan sólo el valor mercantil de la cosa transportada, **calculado en el precio corriente que esa cosa tendría en el día y lugar en que debió entregarse**, es decir, en el precio de venta, como límite normal de la ganancia prevista por el dueño de la mercancía. (Énfasis suplido). Garrigues, op. cit., pág. 232.

Sintetiza Garrigues que se trata del valor mercantil de la cosa, no de su precio de adquisición, ni del precio de la cosa que pueda adquirirse para reemplazar la transportada. Garrigues, op. cit. De modo similar, el tratadista Francisco Miguel Sánchez Gamborino expone que el Código de Comercio español mantiene, en su Art. 363, el principio de la limitación de la responsabilidad, concretándola al precio de venta de la mercancía en el día y lugar de destino. F. M., Sánchez Gamborino, Doctrina jurisprudencial sobre el contrato de transporte terrestre, Aguilar Ediciones, Madrid, 1957, pág. 162. Es decir, la indemnización permitida no alcanza el valor de procedencia

y la ganancia dejada de obtener o el interés subjetivo del perjudicado sino únicamente el valor mercantil de la cosa dejada de entregar, calculado con referencia al día y lugar en que se habría de entregar. F. M., Sánchez Gamborino, op. cit. Según Sánchez Gamborino, lo anterior configura el precio de venta como límite normal previsto por el dueño de la mercancía e impone la necesidad de acreditar cuál es ese valor en cada caso. F. M., Sánchez Gamborino, op. cit.

Por su parte, el tratadista Rodrigo Uría interpreta de forma concisa que ante la pérdida de los objetos transportados el porteador pagará su valor. Uría, op. cit., pág. 535. Además, expone que este sistema de responsabilidad del porteador por pérdidas es el que ofrece el Código de Comercio español frente al esquema general de responsabilidad por incumplimiento contractual del Código Civil, basado en la indemnización de los daños y perjuicios, con la característica particular de limitar el recobro al valor de las cosas porteadas. Uría, op. cit., pág. 536. Fundamenta Uría que "el Art. 363 habla de satisfacer el valor que tuvieran las cosas en el lugar y época en que correspondía hacer la entrega". Uría, op. cit. En particular, es el tratadista Francisco Vicent Chuliá quien mejor esclarece la forma de calcular el valor que permite resarcir el Art. 363. Sostiene Vicent Chuliá que el cálculo de ese valor "viene a suponer una compra forzosa" por el porteador, "el cual indemnizará pagando su

precio en el lugar de destino". Vicent Chuliá, op. cit., pág. 332.

En esa línea, el Tribunal Supremo de España, en su Sentencia de 2 de marzo de 1892, reconoció que "la indemnización de daños y perjuicios no podrá exceder del **precio corriente** que los efectos transportados tendrían en el día y lugar en que debían entregarse". (Énfasis suplido). STS 2 marzo 1892 (71 Jurisprudencia Civil 287, 66). El término "precio corriente", y su uso homólogo de "valor corriente", se han definido como aquel precio "establecido en el momento de realizarse la transacción" y el "precio de un bien expresado en unidades monetarias a un periodo temporal concreto". O. Greco y otros, Diccionario Contable y Comercial, 2da ed., Buenos Aires, Valleta Ediciones, 2003, pág. 542 y F. Martín Ámez, Diccionario de Contabilidad y Finanzas, Madrid, Cultural, S.A., 2003, pág. 269. Más recientemente, el foro español de mayor jerarquía, en su Sentencia de 2 de febrero de 1998, reiteró que el Art. 363 obliga "al porteador a pagar el valor de dichos objetos". STS 2 febrero 1998 (RJ 1998, 616). Además, debemos mencionar que el Tribunal Supremo de España, en su Sentencia de 2 de enero de 1926, reconoció que "al determinar el valor de los efectos cuyo importe debe indemnizar el porteador en los casos de desaparición[…], han de tenerse en cuenta para deducirlos aquellos gastos que el cargador habría de sufragar hasta que aquellos tuvieren entrada en la plaza o mercado de

destino". STS 2 enero 1926 (169 Jurisprudencia Civil 6, 1).

La discusión doctrinal pormenorizada nos permite advertir que nuestro Código de Comercio, _supra_, al igual que el Código de Comercio de España de 1885, se distancia del régimen ordinario del Código Civil y adopta un criterio más restrictivo para la indemnización de los daños que provoque la pérdida de una mercancía transportada. Así, el porteador no es responsable de todos los daños y perjuicios causados por el incumplimiento del contrato mercantil de transporte terrestre, sino que responde únicamente por el valor de la mercancía en el lugar y tiempo pactado para la entrega.

Llegados a este punto, debemos discutir la función de la carta de porte dentro del ejercicio de calcular el valor que concibe el Art. 281 del Código de Comercio, _supra_. En esa labor debemos acudir al Art. 290 del Código de Comercio, 10 LPRA sec. 1794, cuya redacción es idéntica al Art. 372 del Código de Comercio español. Este precepto reconoce que

> [l]a valuación de los efectos que el porteador deba pagar en casos de pérdida o extravío, **se determinará con arreglo a lo declarado en la carta de porte**, sin admitir al cargador pruebas sobre que, entre el género que en ella declaró, había objetos de mayor valor y dinero en metálico. (Énfasis Suplido).

En lo que respecta a este particular, Vicent Chuliá detalla que la carta de porte sirve de prueba de las cosas trasportadas y en estas se suele pactar un límite de

responsabilidad. Vicent Chuliá, op. cit., pág. 332. A su vez, Garrigues enfatiza que la importancia de la carta de porte redunda en su elemento probatorio de carácter privilegiado que permite demostrar la existencia del contrato, la descripción de las mercancías transportadas y las condiciones del contrato. Garrigues, op. cit., págs. 216-217.

Al mismo tiempo, Uría reconoce que el contrato mercantil de transporte terrestre da lugar a la expedición de la carta de porte como documento de fuerza probatoria en el cual las partes pueden recoger "los nombres del porteador, del cargador y del consignatario; la designación de los efectos porteados; el precio; la fecha de la expedición; el lugar de entrega al porteador; la fecha y lugar para la entrega al [destinatario] y la indemnización en caso de retardo". Uría, op. cit., pág. 529. Sin embargo, Garrigues aclara que la carta de porte no es un elemento formal del contrato mercantil de transporte terrestre porque este se perfecciona por el simple acuerdo de voluntades entre el cargador y el porteador. Garrigues, op. cit., págs. 215-216. Sustenta su apreciación en la Sentencia del Tribunal Supremo de España de 6 de mayo de 1895 donde se declaró que el Código de Comercio no exige como requisito necesario para este tipo de contrato la entrega de la carta de porte al cargador, sino que faculta a este y al porteador para que puedan exigírsela mutuamente. Garrigues, op. cit., pág. 216.

Con mayor detalle, el tratadista Rafael Gay de Montellá expone el siguiente análisis en torno a la función de la carta de porte en el modo de realizar la valuación de las cosas perdidas:

> El daño experimentado por las mercancías transportadas, a consecuencia de la pérdida o del extravío, no tiene otra compensación, según la ley, que la indemnización del valor declarado en la carta de porte. Si el cargador ha querido prevenirse de una posible pérdida, debe declarar el valor real de los objetos entregados para el transporte, pero no podrá alegar en el caso de que ocurra el daño, que entre los objetos perdidos los hubiera de mayor valor al declarado y que había dinero metálico. Del mismo modo que no admite la ley el concepto de daño emergente ni lucro dejado de obtener y concreta los términos de la indemnización al daño real y material de la mercancía, no admite el Código tampoco más valor que el declarado por el cargador y admitido por la Compañía en la carta de porte. **En el caso de pérdida total, la Empresa deberá abonar el valor en relación a la calidad y a la especie declaradas en la carta de porte, pudiendo tal valor no solamente estar constituido por el valor intrínseco de la cosa transportada, sino por todos aquellos gastos que hubiere ocasionado con anterioridad a la entrega hecha al portador.**
>
> Pero la valoración hecha por el cargador no puede tenerse por indiscutible, sino que puede, como es de rigor ser objeto de impugnación por parte de la empresa porteadora en el caso de que el cargador hubiera cometido fraude en la declaración. El valor de las mercancías extraviadas o perdidas debe estar en relación con los precios corrientes en la plaza en que debieron entregarse, o, cuando menos, con los precios corrientes en los mercados y plazas vecinos. (Énfasis Suplido). R. Gay de Montellá, Código de Comercio Español Comentado, 2da ed., Barcelona, Bosch Casa Editorial, 1948, Tomo III, Vol. 1, págs. 289-290.

En definitiva, cuando el porteador quebrante su obligación de entregar los objetos transportados en el mismo estado en el que los recibió, debido a pérdida,

vendrá obligado a indemnizar al cargador solamente por el valor que estos tuvieran en el punto donde serían entregados. Cabe destacar que esa valuación se hará con arreglo a lo declarado en la carta de porte. De esa manera, se incentiva que el cargador otorgue una carta de porte con información precisa. Al mismo tiempo, se evita que este se valga de engaño sobre la naturaleza de la mercancía trasladada y "reclame objetos de mayor valor" o "dinero en metálico". Art. 290 del Código de Comercio, supra. Ahora bien, según reconoce Vicent Chuliá, las partes pueden estipular el valor que estimen como límite de responsabilidad o seleccionar cualquier otro sistema de valuación bajo el principio de libertad contractual. Vicent Chuliá, op. cit., pág. 332.

**B.** En el caso bajo análisis, el Tribunal de Primera Instancia se amparó en los comentarios del tratadista Gay de Montellá para resolver que la responsabilidad de FVO se limita a lo declarado en la carta de porte y que, conforme a la documentación no controvertida, el valor de los bienes hurtados era $136,629.36. Por su parte, el Tribunal de Apelaciones confirmó esa determinación y a base del pasaje del tratadista Garrigues concluyó que no procedía compensar a Reynolds por ningún tipo de ganancia dejada de percibir. No existe controversia material sobre las sumas detalladas para el costo de producción de la mercancía, el cómputo de los impuestos y el precio al por mayor de la mercancía. Las partes discrepan solamente en su

apreciación legal sobre cuál de esos importes configura el valor mercantil de las cajas de cigarrillos a la fecha en que debían entregarse. Por un lado, Reynolds sostiene que ese valor es el precio al por mayor de las cajas de cigarrillos, mientras FVO entiende que es el costo de producción de la mercancía.

Luego de examinar las fuentes de derecho aplicables, entendemos que los foros recurridos, así como ambas partes, incidieron en su apreciación del derecho aplicable. La doctrina es clara en torno a que el valor que corresponde resarcir es aquel que los efectos transportados tenían en el lugar y momento donde debían ser entregados. Las expresiones del Tribunal Supremo de España y, sobre todo, los tratadistas nos ilustran que ese valor, al cual se sujeta la responsabilidad del porteador, busca que el cálculo no sea uno complicado que propicie posibles abusos, que no equivalga a la ganancia dejada de percibir, ni a la pérdida concreta del cargador, ni al precio de su adquisición o reemplazo. En efecto, se procuró despersonalizar las relaciones comerciales y fomentar la rapidez que las caracteriza.

Como resultado, el valor concebido para las mercancías perdidas se circunscribe al precio corriente que estas tendrían si en el momento de su descarga fuesen puestas en venta. Hacemos eco de las palabras de Vicent Chuliá y reconocemos que el Art. 281 de Código de Comercio, supra, instituye una especie de adquisición forzosa en la que el

porteador que pierde las cosas trasportadas viene obligado a comprarlas en el momento en que debía entregarlas y según fueron declaradas en la carta de porte. En otras palabras, el porteador deberá "comprar" los artículos que extravió al precio corriente en el tiempo en que debieron ser entregados, como si fuera un comerciante más. Resolvemos que el valor mercantil contemplado en el Art. 281 del Código de Comercio, supra, para el supuesto de la mercancía perdida, no es el precio de producción de la mercancía o de su reemplazo, ni automáticamente el precio de venta al por mayor, como interpretan las partes y los foros recurridos. Tampoco es, necesariamente, el precio de venta al detal, sino el precio corriente que los artículos tendrían cuando se suponía su entrega. Es decir, la estimación del valor compensable no es un ejercicio mecánico y dependerá de las circunstancias fácticas en cada caso.

El foro primario concluyó que el documento titulado "Despacho de Producto" debía considerarse como la carta de porte y que, según el Art. 290 del Código de Comercio, supra, el valor resarcible de las cajas de cigarrillos era $136,629.36. No encontramos en el expediente apoyo para esa determinación. Si bien el documento en cuestión puede ser catalogado como la carta de porte, este solo recoge el costo de producción de la mercancía transportada. Además, no surge que las partes hayan pactado que ese sería el valor resarcible de la mercancía en caso de pérdida. En

ese sentido, nos parece que el Art. 290 del Código de Comercio, supra, prohíbe que, una vez descrito el género de las cosas transportadas en ese documento, Reynolds pueda alegar que las cajas de cigarrillos eran de un género más valioso y que había dinero en metálico en el vagón hurtado. Es decir, como documento probatorio privilegiado, el documento titulado "Despacho de Producto" limita la valoración que corresponde realizar bajo el Art. 281 del Código de Comercio, supra. Sin embargo, esto no impide que Reynolds demuestre cuál era el precio corriente del género de las cosas descritas en la carta de porte para el momento en que se había contratado su entrega.

Debido a que la mercancía sería transportada y entregada en el centro de distribución de Reynolds en Mayagüez para su posterior distribución a varios detallistas, Reynolds nos sugiere que el valor resarcible se acerca más al precio al por mayor de las cajas de cigarrillos hurtadas. Ese era el precio que los detallistas estaban dispuestos a pagar por la mercancía hurtada en el lugar y en el momento coetáneo a la entrega. Sin embargo, esta apreciación no es susceptible de adjudicarse por la vía sumaria. Si bien en el expediente obran dos sumas monetarias incontrovertidas con respecto al costo de producción de la mercancía y su precio al por mayor, nos percatamos que ninguno de esos montos es el que concede el Código de Comercio. Consecuentemente, no podemos, como cuestión de estricto derecho, dictar

sentencia a favor de una u otra parte. Falta que las partes diriman y establezcan cuál era exactamente el precio corriente de las cajas de cigarrillos, del tipo y especificaciones declaradas en el "Despacho de Producto", en el centro de distribución de Reynolds en Mayagüez, para la fecha en la que correspondía hacer la entrega. Esa cuantía configura el límite de la responsabilidad por la pérdida e impone sobre las partes la necesidad de acreditar cuál era ese valor. Es menester señalar que a esa cantidad se le deberán sumar los gastos que el cargador hubiere incurrido con anterioridad a la entrega, tales como el pago de los impuestos, y se deberán deducir los gastos que el cargador habría de sufragar hasta que la mercancía llegara a su destino, según ordenaron correctamente los foros recurridos. Procede devolver el caso al Tribunal de Primera Instancia para que se esclarezca esta suma.

IV

Por los fundamentos antes expuestos, se revoca la sentencia del Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia, Sala Superior de San Juan, para que los procedimientos continúen de manera consistente con esta Opinión.


Rafael L. Martínez Torres
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

R.J. Reynolds Tobacco (CI), Co.

    Peticionarios

        v.

Francisco Vega Otero, Inc., MAPFRE PRAICO Insurance Company; MAPFRE PRAICO Corporation; y Aseguradora X

    Recurrida

AC-2015-0104

SENTENCIA

En San Juan, Puerto Rico, a 29 de marzo de 2017.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de esta Sentencia, se revoca la sentencia del Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia, Sala Superior de San Juan, para que los procedimientos continúen de manera consistente con esta Opinión.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Estrella Martínez concurrió con el resultado sin opinión escrita.

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo