Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| | | |
|---|---|---|
| CONSEJO DE TITULARES DEL CONDOMINIO VILLAS DE PARKVILLE II<br><br>Recurrido / Apelado<br><br>v.<br><br>CHUBB INSURANCE COMPANY OF PUERTO RICO<br><br>Peticionario / Apelante | TA2025CE00816<br><br>Consolidado con<br><br>TA2025AP00600 | *Certiorari*<br>Procedente del Tribunal de Primera Instancia, Sala de BAYAMÓN<br><br>Caso Núm.: BY2024CV03388<br><br>Sobre: Incumplimiento de Contrato de Seguro; Petición de Interdicto Preliminar y Permanente; Daños y Perjuicios |

Panel integrado por su presidenta la Jueza Rivera Marchand, la Jueza Mateu Meléndez, la Jueza Boria Vizcarrondo y el Juez Robles Adorno.

Mateu Meléndez, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de abril de 2026.

El 26 de noviembre de 2025, Chubb Insurance Company of Puerto Rico (Chubb) presentó ante este Tribunal de Apelaciones el recurso de *certiorari* número **TA2025CE00816,** mediante el cual recurrió de la *Resolución Interlocutoria* dictada en el caso de epígrafe por el Tribunal de Primera Instancia, Sala Superior de Bayamón (TPI o foro primario).[1] Mediante el aludido dictamen, el TPI concedió las cosas solicitadas por el Consejo de Titulares del Condominio Parkville II (Consejo de Titulares).

En la misma fecha, Chubb también sometió la apelación número **TA2025AP00600** en el que nos solicita la revocación de la *Sentencia Parcial* emitida por el foro primario el 30 de septiembre de 2025, notificada el 2 de octubre del mismo año. Por virtud de esta, el TPI, luego de recibir y evaluar la prueba sometida por las partes en la correspondiente vista evidenciaria, dictaminó que los daños estructurales sufridos por el muro de retención

---

[1] El dictamen recurrido fue notificado el día 27 de octubre de 2025. Véase, SUMAC-TPI, Entrada Núm. 102.

que ubica en Villas de Parkville II son una pérdida cubierta bajo la póliza que Chubb emitió a favor del Consejo de Titulares.

Evaluados ambos recursos, con el beneficio de la transcripción de la prueba, al amparo del derecho que más adelante consignaremos, resolvemos **denegar** el recurso de *certiorari* **TA2025CE00816** y **confirmar** la *Sentencia Parcial* apelada a través de la apelación número **TA2025AP00600**.

-I-

El 10 de junio de 2024, El Consejo de Titulares instó contra Chubb una *Demanda* por incumplimiento de contrato de seguro, interdicto preliminar y permanente y daños y perjuicios.[2] En esta, indicó que el 14 de septiembre de 2021, Chubb emitió a su favor la Póliza de Seguro número 95PR-000100821-3 (la Póliza) que contiene disposiciones, cláusulas y endosos relacionados a daños causados por vientos, agua, inundaciones, socavones y erosión de terreno causados por tormentas y huracanes.

De igual forma, relató que las lluvias torrenciales generadas por el Huracán Fiona el 18 de septiembre de 2022, ocasionaron la elevación de las aguas y su consecuente desbordamiento en la quebrada Los Frailes que bordea el condominio. A consecuencia de esto, se alegó que el nivel de las aguas torrenciales superó la altura del desagüe pluvial del condominio, lo que creó un contraflujo entre las aguas, socavándose finalmente la base estructural del muro de retención y el consecuente colapso del muro. Según hizo constar el Consejo de Titulares, "además de quedar deshabilitados y vacados a partir de este evento catastrófico los indicados 17 apartamentos residenciales, el antes citado deslave y deslizamiento causó que quedaran igualmente deshabilitadas y vacadas en una línea longitudinal, tres infraestructuras comunes críticas para el funcionamiento del condominio

---

[2] Las causas de acción específicas incluidas en la *Demanda* fueron las siguientes: interdicto preliminar y permanente, incumplimiento de Contrato bajo el Código Civil y/o bajo el Código de Seguros, daños extracontractuales y punitivos e imposición de honorarios de abogado por temeridad litigiosa.

que lo fueron: (a) el suministro de agua potable, (b) el sistema sanitario, y (c) el de disposición de aguas pluviales."

El Consejo indicó haber reclamado a Chubb por los daños sufridos a consecuencia del Huracán Fiona. No obstante, tras múltiples inspecciones y reuniones con sus representantes, la aseguradora denegó la cubierta bajo la póliza fundamentándose en una de las exclusiones contenidas en la póliza al clasificar el evento como uno de movimiento de tierra.

Habiéndose emplazado a Chubb, esta compareció el 18 de junio de 2024, mediante *Moción Solicitando Desestimación Parcial Bajo la Regla 10.2* en la que, como anuncia su título, peticionó que se desestimara: la causa interdictal preliminar y permanente, por no cumplir con los requisitos indispensables para ser concedida; la reclamación basada en las disposiciones del Art. 27.164, por no haberse cumplido con las exigencias que el propio artículo impone; y la causa de acción extracontractual por no ser plausible. Frente a tal escrito, el 21 de junio de 2024, el Consejo de Titulares sometió su *Oposición a Solicitud de Desestimación Parcial*.

Así las cosas, el 24 de junio de 2024, el foro primario celebró la vista de interdicto. Luego de allí escuchar a las partes, y por entender que era primordial en primera instancia determinar si en efecto los daños estaban cubiertos por la póliza, señaló vista evidenciaria con dicho fin para los días 7 y 8 de noviembre de 2024 y para el 8 de enero de 2025.[3]

Celebrada la vista, añadiéndose en el transcurso fechas adicionales, el TPI solicitó a las partes que sometieran sendos memorandos de derecho, concediéndoles para ello hasta el 20 de agosto de 2025. En cumplimiento con ello, ese día, tanto Chubb como el Consejo de Titulares así lo hicieron.

---

[3] Cabe destacar que, durante la audiencia, el Tribunal acogió la solicitud de desestimación en cuanto a la figura del interdicto, así como el desistimiento voluntario sin perjuicio del Consejo en cuanto a su reclamación bajo el Artículo 27.164 del Código de Seguros. A tales efectos, el 29 de julio de 2024, dictó *Sentencia Parcial,* notificándose esta el día 31.

Posteriormente, el TPI dictó la sentencia apelada. En esta, formuló 49 determinaciones de hechos. Basándose en ellas, dictaminó lo siguiente:

> En vista de los hechos, documentos, informes periciales y testimonios de los peritos demuestran inequívocamente que la causa de la pérdida fue la inundación, un riesgo expresamente cubierto por la póliza mediante un endoso pagado, y que la negativa de la demandada se basa en una interpretación errónea de la Póliza objeto de la presente controversia, resolvemos que la pérdida del Condominio Villas de Parkville II es una pérdida cubierta bajo la póliza de seguros núm. 95PR-000100821-3 expedida por Chubb Insurance Company of Puerto Rico.[4]

Además de ello, el TPI entendió que Chubb había actuado temerariamente y de forma "obstinada y contumaz". A consecuencia de ello, le impuso la suma de $5,000.00, así como las costas y gastos del procedimiento incurridos por el Consejo de Titulares. Dictada la sentencia, el Consejo de Titulares presentó *Memorando de Costas* en reclamo de los gastos incurridos en la gestión hecha.

El 17 de octubre de 2025, Chubb solicitó reconsideración de la sentencia parcial dictada. A su vez, el día 20 del mismo mes y año, sometió su *Oposición al Memorando de Costas.* En respuesta a estos últimos dos escritos, el 23 de octubre de 2025, dictó *Resolución Interlocutoria* el foro primario en la que concedió las costas solicitadas por el Consejo de Titulares en cuanto a los honorarios de los peritos, ordenándole a Chubb el pago de los servicios prestados por sus peritos.[5] No obstante, resolvió que el resto de las costas solicitadas, eran prematuras en la etapa de los procedimientos en que se encontraba el caso.

En desacuerdo aun, Chubb instó los recursos consolidados de epígrafe. Así pues, en su *Petición de Certiorari* número **TA2025CE00816**, señaló la comisión de los siguientes errores:

> PRIMERO: ERRÓ EL TPI AL CONCEDERLE AL RECURRIDO, COMO COSTAS, EL PAGO DE LOS SERVICIOS PRESTADOS POR SUS PERITOS DURANTE VISTAS EVIDENCIARIAS SOBRE LA DETERMINACION DE CUBIERTA, A PESAR DE QUE LA ADJUDICACIÓN FINAL DEL CASO NO HA OCURRIDO.

---

[4] SUMAC-TPI, Entrada 98, pág. 22.
[5] Los honorarios concedidos fueron $7,131.25, por el trabajo del perito Sr. Carlos Olivencia Gayá, y $9,800.00, por aquel del Ing. Mediavilla. SUMAC-TPI, Entrada Núm. 109.

SEGUNDO: ERRÓ EL TPI AL CONCEDERLE AL RECURRIDO, COMO COSTAS, EL PAGO DE LOS SERVICIOS PRESTADOS POR EL ING. MEDIAVILLA.[6]

Mientras tanto, por medio de la apelación número **TA2025AP00600**, afirmaron que el TPI se equivocó al decretar que la pérdida sufrida está cubierta por la póliza que emitió en favor del Consejo de Titulares, al acoger el testimonio del Ingeniero José Mediavilla Prado (ingeniero Mediavilla) como la de un perito de opinión y al no establecer parámetro alguno en cuanto a las vistas evidenciarias a celebrarse sobre la cubierta.[7] El 12 de diciembre de 2025, dictamos *Resolución* mediante la que consolidamos ambos recursos. Tras los trámites pertinentes, ambos recursos se han perfeccionado. Así pues, damos por sometido el asunto y procedemos a resolverle, no sin antes exponer la norma jurídica aplicable. Veamos.

-II-

*A.*

El vehículo procesal de *certiorari* permite a un tribunal de mayor jerarquía a revisar discrecionalmente las órdenes o resoluciones interlocutorias emitidas por una corte de inferior instancia judicial. *Rivera et al. v. Arcos Dorados et al.*, 212 DPR 194, 195 (2023) al citar a *McNeil Healthcare v. Mun. Las Piedras I*, 206 DPR 391, 403 (2021) y otros. La característica distintiva del recurso de *certiorari* descansa en la discreción encomendada a este Tribunal de Apelaciones para autorizar su expedición y adjudicar sus méritos. *Íd.* De ordinario, la discreción consiste en "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera". *BPPR v. SLG Gómez-López*, 213 DPR 314 (2023) y casos allí citados. Empero, el ejercicio de la discreción concedida "no implica la potestad de actuar arbitrariamente, en una u otra forma, haciendo abstracción del resto del derecho." *Íd.*

---

[6] SUMAC-TA, TA2025CE00816, Entrada Núm. 1, pág. 10.
[7] SUMAC-TA, TA2025AP00600, Entrada Núm. 1, página 10.

De otro lado, el examen de estos autos discrecionales no se da en el vacío o en ausencia de otros parámetros. *800 Ponce de León v. AIG*, 205 DPR 163 (2020). Para ello, la Regla 40 de nuestro Reglamento establece ciertos indicadores a tomar en consideración al evaluar si se debe o no expedir un recurso de *certiorari*.[8] Estos criterios, pautan el ejercicio sabio y prudente de la facultad discrecional judicial. *Mun. de Caguas v. JRO Construction*, 201 DPR 703, 712 (2019).

*B.*

El contrato de seguro es aquel acuerdo entre una persona denominada "asegurador" y otra parte llamada "asegurado", en donde el primero, a cambio de una contraprestación, se obliga a indemnizar al segundo o a proveerle un beneficio específico o determinable al producirse un evento incierto, pero previsto en el mismo.[9] En este, el asegurador asume determinados riesgos a cambio del cobro de una prima o cuota periódica, en virtud de la que se obliga a responder por la carga económica que recaiga sobre el asegurado de ocurrir un suceso especificado en el contrato. *ECP Incorporated v. OCS*, 205 DPR 268, 278 (2020), al citar a *S.L.G. Francis-Acevedo v. SIMED*, 176 DPR 372 (2009) y otros. Así pues, la función primordial de una póliza de seguro es establecer un mecanismo para transferir un riesgo y de esta manera proteger al asegurado de ciertos eventos identificados en el contrato de seguros. *Savary et al. v. Mun. Fajardo et al.*, 198 DPR 1014, 1023

---

[8] Así pues, según la citada regla, estos indicadores son: si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho; si la situación de hechos planteada es la más indicada para el análisis del problema; si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia; si el asunto planteado exige una consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados; si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración; si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio; o si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia. Véase, Regla 40 del Reglamento del Tribunal de Apelaciones, según enmendada, *In re. Aprob. Enmdas. Reglamento TA*, 2025 TSPR 141, 216 DPR ___ (2025).

[9] Art. 1.020 del Código de Seguros, 26 LPRA sec. 102. Véase también, *Barreto Nieves v. East Coast Water Sports, LLC;* 213 DPR 852 (2024); *San Luis Center Apts. Et al. v. Triple-S,* 208 DPR 824, 830-832 (2022); y *Rivera Matos v. ELA,* 204 DPR 1010, 1020 (2020).

(2017), al mencionar a *R.J. Reynolds v. Vega Otero*, 197 DPR 699 (2017) y otros.[10]

El Código de Seguros de Puerto Rico, 26 LPRA sec. 101 *et seq.*, (Código de Seguros) es la ley que reglamenta las prácticas y los requisitos del negocio de seguros. *Jiménez López et al v. SIMED*, 180 DPR 1 (2010).[11] Conforme establece el Código de Seguros, todo contrato de seguro deberá interpretarse globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido, o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de ésta.[12] Así pues, corresponde interpretar el lenguaje plasmado en la póliza en su acepción de uso común general, sin ceñirse demasiado al rigor gramatical. *Rivera Matos v. ELA*, supra, al citar a *Jiménez López et al. v. Simed*, *supra*; y otros. Asimismo, las cláusulas de la póliza se examinarán desde el punto de vista de una persona normal de inteligencia promedio que fuese a adquirir el seguro. *Rivera Matos v. ELA*, *supra*, al mencionar a *S.L.G. Ortiz-Alvarado v. Great American*, 182 DPR 48 (2011).

En cuanto al ejercicio de interpretación, es menester establecer que los términos del contrato de seguro se consideran claros cuando su lenguaje es específico, sin que dé lugar a dudas, ambigüedades o sea susceptible de diferentes interpretaciones. *Barreto Nieves v. East Coast Water Sports, LLC*, supra, a la pág. 864. Los términos de las pólizas de seguro deben ser generalmente entendidos en su más corriente y usual significado, sin

---

[10] Se denomina póliza el documento donde se consignan los términos que rigen el contrato de seguro. Art. 11.140(1) del Código de Seguros, 26 LPRA sec. 1114(1).

[11] Es menester destacar que el negocio de seguros está revestido de un alto interés público, por lo que ha sido regulado ampliamente por el Estado. *Molina v. Plaza Acuática*, 166 DPR 260, 266 (2005). Así ha sido reconocido en reiteradas ocasiones por nuestro Tribunal Supremo. Véase, *Barreto Nieves v. East Coast Water Sports, LLC*, supra; *Con. Tit. Aquamarina et al. v. Triple-S*, 210 DPR 344, 355 (2022); *Consejo Titulares v. MAPFRE*, 208 DPR 761, 773 (2022); *Maderas Tratadas v. Sun Alliance et al.*, 185 DPR 880, 896 (2012).

[12] Art. 11.250 del Código de Seguro de Puerto Rico, 26 LPRA sec. 1125. Véase también, *Barreto Nieves v. East Coast Water Sports, LLC*, supra; *R.J. Reynolds v. Vega Otero*, 197 DPR 699, 707-708 (2017); *San Luis Center Apts. Et al. v. Triple-S*, supra, y *Echandi Otero v. Stewart Title*, 174 DPR 355, 369 (2008).

atender demasiado al rigor gramatical, sino al uso general y popular de las voces. *Id.,* al mencionar a *Echandi Otero v. Stewart Title*, *supra*, a la pág. 370. Sin embargo, toda vez que el contrato de seguro es uno de adhesión, redactado en su totalidad por el asegurador, aquellas cláusulas dudosas o ambiguas deben interpretarse liberalmente en beneficio del asegurado. *Maderas Tratadas v. Sun Alliance et al.,* supra.

Igualmente, será necesario examinar si existen cláusulas de exclusión en el contrato por virtud de las que la aseguradora exceptúa determinados eventos, riesgos o peligros de la cubierta. *Viruet et al. v. SLG Casiano-Reyes*, 194 DPR 271 (2015). Tales exclusiones deben interpretarse restrictivamente a favor del asegurado, para así cumplir con el propósito de todo seguro de ofrecer la mayor protección a la persona asegurada. *Barreto Nieves v. East Coast Water Sports, LLC,* supra, págs. 864-865, y casos allí citados. No obstante, si los términos de las cláusulas de exclusión son claros y aplican a una situación determinada, no podría responsabilizarse a la aseguradora por aquellos riesgos expresamente exceptuados. *Id.*, pág. 865.

Cabe destacar que le corresponde al asegurado el peso de establecer que su reclamación está comprendida dentro de las disposiciones del contrato de seguro. Por su parte, es la aseguradora quien tiene que evidenciar que aplica alguna exclusión. *Rivera Matos v. ELA*, *supra*, al citar a *Insurance Claims and Disputes*, 6ta ed., St. Paul, Minn., Ed. Thompson Reuters, 2013, Sec. 9.1, págs. 9-2 y 9.6 (2013).

### C.

Es norma hartamente conocida en nuestro ordenamiento jurídico que, ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, no se favorece la intervención de los tribunales apelativos en "la apreciación de la prueba", la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia. *Peña Rivera v.*

*Pacheco Caraballo*, 213 DPR 1009, 1011 (2024) al citar a *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 778 (2022) y otros.

Esta deferencia judicial, está predicada en que los jueces de las salas de instancias están en mejor posición de aquilatar la prueba testifical debido a que estos tienen la oportunidad de oír, ver y apreciar el comportamiento del testigo. *Íd.*, al mencionar a *Ortiz Ortiz v. Medtronic*, *supra* a la pág. 779, y otros. La deferencia debida a los foros primarios se extiende tanto a la adjudicación de credibilidad que éstos realizan sobre los testigos que declaran ante sí, como a las determinaciones de hechos que el juzgador de hechos realiza. *Pueblo v. Negrón Ramírez*, 213 DPR 895, 897 (2024), al citar a *Pueblo v. Toro Martínez*, 200 DPR 834, 836 (2018) y otros. Sin embargo, a modo de excepción, los foros apelativos estamos en las mismas condiciones que el tribunal de instancia para intervenir y apreciar *de novo* la prueba documental que se haya presentado en un juicio. *Id.*, al citar a *Díaz García v. Aponte Aponte*, 125 DPR 1, 3 (1989). Así pues, la regla de deferencia discutida se exceptúa cuando se trata de determinaciones de hechos que se apoyan exclusivamente en prueba documental o pericial, ya que los tribunales apelativos estamos en idéntica posición que el tribunal inferior al examinar este tipo de prueba y adoptar nuestro propio criterio. *Pueblo v. Hernández Doble*, 210 DPR 850 (2022) al citar a *González Hernández v. González Hernández*, 181 DPR 746 (2011).

Es menester señalar que existe error manifiesto cuando el foro apelativo queda convencido de que existe un conflicto entre las conclusiones alcanzadas por el Tribunal de Primera Instancia y el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida. Entiéndase pues, cuando la apreciación de la prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble. *Peña Rivera v. Pacheco Caraballo*, *supra* a la pág. 1012. Por su parte, el concepto de pasión, prejuicio y parcialidad han sido definido como aquellas inclinaciones

personales de tal intensidad que llevan a un juzgador a actuar movido por éstas y a adoptar posiciones, preferencias o rechazos con respecto a las partes o sus causas, sin admitir cuestionamientos sobre las mismas y sin importar la prueba que se haya presentado en el juicio. *Pueblo v. Negrón Ramírez*, *supra*, al mencionar a *Ortiz Ortiz v. Medtronic*, *supra* y demás casos allí citados.

Aparte de lo previamente consignado, un foro apelativo puede intervenir con las determinaciones de hechos y la apreciación de la prueba si se demuestra que este incurrió en un abuso de discreción al apreciar y adjudicarla. A tales efectos, se incurre en abuso de discreción cuando el juez: "(1) ignora sin fundamento algún hecho material importante que no podía pasar por alto; (2) concede demasiado peso a un hecho inmaterial y funda su decisión principalmente en ese hecho irrelevante, o (3) a pesar de examinar todos los hechos del caso, hace un análisis liviano y la determinación resulta irrazonable".

### D.

En nuestro ordenamiento jurídico, la concesión de costas se rige por lo provisto por la Regla 44.1 de Procedimiento Civil. Mediante la discutida norma, se busca resarcir a la parte que advenga victoriosa en el caso mediante el reembolso de aquellos gastos que se estimen necesarios y razonables para prevalecer en su posición. *Maderas Tratadas v. Sun Alliance*, supra, pág. 934, al citar a *J.T.P. Dev. Corp. v. Majestic Realty Corp.*, 130 DPR 456, 460 (1992); *Rodríguez Cancel v. A.E.E.*, 116 DPR 443, 461 (1985); *Ferrer Delgado v. Tribunal Superior*, 101 DPR 516, 517 (1973).

Una vez reclamadas por la parte prevaleciente, la imposición de costas a beneficio de la parte prevaleciente resulta mandatoria. Ahora, no todos los gastos del litigio son recobrables. *Íd.* y casos allí citados. Así pues, quedan sujetos a las disposiciones de la discutida norma procesal únicamente aquellos gastos que se consideren necesarios en la gestión

judicial. Le corresponde al tribunal, en el ejercicio de su discreción, evaluar la razonabilidad de éstos. *Íd.* a la pág. 935, al al citar a *J.T.P. Dev. Corp. v. Majestic Realty Corp.*

En el caso particular de los expertos contratados por las partes, el reembolso opera por vía de excepción y se concederán únicamente cuando esté plenamente justificado. *Maderas Tratadas v. Sun Alliance,* pág. 935 al mencionar a *Andino Nieves v. AAA*, 123 DPR 712 (1989); *Toppel v. Toppel*, 114 DPR 16, 22 (1983); y *Meléndez v. Levitt & Sons of PR*, 104 DPR 787, 811 (1976). La designación de la compensación de un perito como costas está sujeta a los rigores del escrutinio judicial a través del cual se examinará tanto la naturaleza de su preparación, como la utilidad de su intervención. Esto significa que, deberán tomarse en cuenta las credenciales que ostenta el experto designado para rendir una opinión sobre una materia en particular. También corresponderá examinar el alcance de su testimonio, para de este modo estar en posición de aquilatar su utilidad en beneficio de la postura procesal de la parte que resulte victoriosa. Cónsono con lo anterior, se descartará en la medida en que éste resulte "irrelevante, inmaterial o innecesario" en la tramitación del caso del que solicita el rembolso. *Íd.*, pág. 936.

*E.*

"El efectivo funcionamiento de nuestro sistema judicial y la rápida disposición de los asuntos litigiosos requieren que los jueces de instancia tengan gran flexibilidad y discreción para lidiar con el diario manejo y tramitación de los asuntos judiciales". *BPPR v. SLG Gómez-López*, 213 DPR 314 (2023), al citar a *In re Collazo I*, 159 D·R 1421, 150 (2003) y *Pueblo v. Vega, Jiménez*, 121 DPR 282, 287 (1988). Así, el Tribunal de Primera Instancia tiene amplia discreción sobre el manejo de los casos que ante sí se ventilan.[13]

---

[13] Id., al mencionar a *Vives Vázquez v E.L.A.*, 142 DPR 117, 141 (1996).

Los jueces de primera instancia "tienen a su alcance múltiples mecanismos procesales para mantener y asegurar el orden en los procedimientos ante su consideración, para hacer cumplir a cabalidad sus funciones." *In re Collazo I*, supra; *ELA v. Asociación de Auditores*, supra. Igualmente, poseen amplia facultad para revolver los procesos que se encuentran ante su consideración. También, están compelidos a actuar activamente en el manejo de los casos. Su objetivo es que se logre una solución justa, rápida y económica de los litigios. *Vives Vázquez v. ELA*, 142 DPR 117 (1996).

Es norma legal, que prevalezca el criterio del juez de la corte primaria si se funda en base razonable y no resulta perjudicial a los derechos sustanciales de una parte. Además, no entraremos o sustituiremos el discernimiento utilizado por el juez que atiende los procesos, salvo, que haya incurrido en perjuicio, parcialidad, error manifiesto o error en el ejercicio de su discreción. Véase, *Trans-Oceanic Life Ins. v. Oracle Corp.*, 184 DPR 689, 709 (2012) y *Luch v. España Services Sta.*, 117 DPR 729, 745 (1986).

La deferencia al juicio y a la discreción del foro sentenciador está fundamentada en el principio de que los foros apelativos no pueden pretender conducir ni manejar el trámite ordinario de los casos que se ventilan ante el Tribunal de Primera Instancia. Como es harto sabido, dicho foro es el que mejor conoce las particularidades del caso y quien está en mejor posición para tomar las medidas necesarias que permitan cimentar el curso a trazar y así llegar eventualmente a una disposición final. *Mejías et al., v. Carrasquillo et al.*, 185 DPR 288, 306-307 (2012). Ahora, la discreción no implica que los tribunales puedan actuar de una forma u otra en abstracción del resto del derecho.[14] De esta manera, un tribunal abusa de su discreción

---

[14] *BPPR v. SLG Gómez-López*, supra a la pág. 335, al mencionar a *Rivera et al. v. Arcos Dorados et al.*, *supra*.

cuando no toma en cuenta e ignora en la decisión que emite, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto; cuando el juez, por el contrario, sin justificación ni fundamento alguno, concede gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en éste, o cuando tras considerar y tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez los sopesa y calibra livianamente.

-III-

Si concordamos con Chubb y concluyéramos que en el caso de autos la pérdida reclamada por el Consejo de Titulares no está cubierta por la póliza expedida, nada habría que disponer en cuanto a los demás señalamientos de error. Por ello, atenderemos primero este asunto.

En su escrito de apelación, y en cuanto a la extensión de la cubierta de la póliza expedida, Chubb afirma que el Consejo de Titulares no probó la ocurrencia de una inundación según definida específicamente en el Endoso DF-52, sino que más bien demostró la ocurrencia de un colapso por causas geotécnicas provocado por un aumento en el nivel freático del terreno y el contraflujo de aguas por tuberías de descarga pluvial. Según Chubb, y de conformidad con la forma CP 10 30 10 12 de la póliza, tal evento queda excluido. A esto, y con el objeto de atacar la credibilidad otorgada por el foro primario al testimonio del ingeniero Mediavilla, añade que si bien este testificó que el agua de la quebrada superó los *box culverts* que se encontraban al lado opuesto del muro, tal declaración se hizo sin conocimiento, sin que dicho dato obrase en informes, y sin contar con evidencia sobre el particular.

A esto, Chubb añade que la interpretación dada por el TPI al Endoso DF-52 fue una excesivamente amplia que ignoró que un endoso de seguro es una modificación puntual al contrato con el fin de añadir o restringir ciertos riesgos específicos. Así, expone que, en su análisis, el tribunal trató

el mencionado endoso como una cobertura absoluta y que, en su hacer, tornó irrelevante otras cláusulas; específicamente, la cláusula de causalidad anti-concurrente. A juicio de Chubb, la evaluación del foro primario contravino las disposiciones del Código de Seguros, así como la jurisprudencia vigente, que exigen una interpretación a base del conjunto total de los términos de la póliza.

Similarmente, en su alegato suplementario Chubb señala que el Consejo no aportó a través de la declaración del ingeniero Mediavilla evidencia concreta de la ocurrencia de una inundación según definida por la póliza. De hecho, niega que la intervención del ingeniero respondiera a la de un perito de opinión, sino que las circunstancias lo sitúan en la categoría de un perito de ocurrencia, "cuya función principal es aportar información derivada de su experiencia directa y previa de los hechos, y no la de emitir opiniones técnicas independientes sobre materia controvertida en el proceso judicial." A esta discusión, agrega que el análisis del ingeniero Mediavilla se basó en una interpretación técnica personal del concepto de inundación y que la omisión de datos concretos y la ausencia de evidencia sobre el desbordamiento de la quebrada refuerza su imputación de error. Manifiesta que, al decretar cobertura basándose en lo dicho por el ingeniero Mediavilla, el TPI ignoró que la carga probatoria recae en el asegurado para demostrar que el siniestro encaja dentro de los parámetros definidos por el contrato.

De igual modo, para atacar el decreto de cubierta, Chubb cuestiona el testimonio del Sr. Carlos Olivencia Gayá, perito en seguros del Consejo (señor Olivencia). Específicamente, establece que a pesar de que este reconoció expresamente la claridad y precisión de la definición de inundación establecida en el Endoso DF-52, optó por adoptar la interpretación propuesta por el ingeniero Mediavilla. Más aun, plantea que la postura del señor Olivencia evidencia las deficiencias en la valoración del

Endoso DF-52 y en la aplicación de la cláusula de causalidad anti concurrente.

Por su parte, el Consejo de Titulares, al defender la decisión apelada, sostiene que cada una de las determinaciones de hechos formuladas por el TPI se apoyan en los testimonios vertidos durante las audiencias celebradas. En particular, argumenta que tanto el testimonio del ingeniero Mediavilla, así como el del señor Olivencia, evidenció que el mecanismo de falla no respondió a un simple movimiento de tierra, ni a defectos de construcción preexistentes, sino a presiones hidrostáticas derivadas de un evento de inundación.

Específicamente, indicó que el ingeniero Mediavilla documentó que durante el paso del huracán Fiona, la crecida en la quebrada rebasó la elevación de descarga de la cabecera en el muro a lo largo de la colindancia este, que provocó un contraflujo por la tubería pluvial. Esto, a su vez, ocasionó la rotura y desarticulación de la tubería e impidió la salida de las escorrentías pluviales, produciéndose de forma simultánea una inundación sobre el terreno y una saturación del suelo en el rehincho del lado interior del muro. Igualmente, la inundación y la saturación del suelo elevaron abruptamente el nivel freático y generó cargas hidrostáticas laterales excesivas e insostenibles en la estructura del muro, lo que causó las falles estructurales observadas. El Consejo señala que estos hallazgos confirman que la pérdida fue consecuencia directa y concurrente de la inundación.

También, plantea que, durante su testimonio, el señor Olivencia declaró que el Endoso DF-52 amplía la cobertura de la póliza para incluir "pérdidas directas o indirectas causadas por inundaciones, sin importar su causa, lo que evidencia la intención contractual de cubrir dicho riesgo. Asimismo, añade que la frase *howsoever caused* contenida en el mencionado endoso elimina la causalidad anti-concurrente que Chubb invoca, por lo que la interpretación propuesta por la aseguradora es contraria a la práctica

de la industria de seguros y al contrato modificado mediante el pago de prima adicional.

Por otro lado, el Consejo arguye que el señor Tilden, perito de Chubb, presentó un análisis lleno de contradicciones y omisiones sin sustento técnico. Particularmente, señaló que este admitió no ser ingeniero, depender de documentos preparados por terceros y no revisar el expediente completo. También, indica que el señor Tilden aceptó que nadie rebatió las conclusiones alcanzadas por el ingeniero Mediavilla, aceptó que el Endoso DF-52 enmendó las exclusiones del Special Form, que este no fue redactado por el Consejo, que allí se define inundación como desbordamiento de cuerpos de agua *howsoever caused* y que el mismo cubre pérdidas directas o indirectas (*direct or indirect loss).*

Basándose en estos señalamientos, el Consejo establece que los hechos, documentos, informes periciales y testimonios de sus peritos demostraron inequívocamente que la causa de la pérdida fue una inundación, riesgo expresamente cubierto por la póliza mediante endoso pagada, por lo que la decisión del TPI que así lo determina debe ser confirmada.

Tal cual citamos en el acápite II de esta sentencia, la carga probatoria para establecer que su reclamación está comprendida dentro de las disposiciones del contrato de seguro recae en el asegurado. Por ser así, a los fines de evaluar la decisión de cubierta apelada, nos dimos a la tarea de estudiar los testimonios desfilados durante la vista evidenciaria, así como examinar los documentos sometidos en evidencia por el Consejo en apoyo de su reclamación. En nuestro análisis, hemos identificado y procedemos a reproducir las porciones de los testimonios que nos resultan más relevantes e íntimamente relacionados al asunto que debemos zanjar. Comenzamos con las partes del testimonio vertido en la vista evidenciaria por el ingeniero

Mediavilla, quien durante el directo que le fue realizado, declaró lo siguiente con relación a la causa de la pérdida reclamada por el Consejo:

P       De acuerdo a su informe, su observación y el estudio, ¿qué evento ocurre que tiene la consecuencia de haber quebrado en tres puntos la pantalla de este muro de contención?

R       Las fallas que se observaron siguen el mecanismo de haber tenido una carga [hidrostática] en el suelo que se retiene debido a un aumento del nivel freático. El nivel freático es el manto del agua que sube o estaba a nivel del pelo de agua de la quebrada. Y al existir una crecida, el nivel freático aumenta a la misma vez que está el nivel del agua de la quebrada subiendo.

La quebrada sobrepasa los niveles de los drenajes existentes del muro. Hay un "*counterflow*", un retroflujo de agua hacia adentro de la propiedad por la tubería y desagües existentes del muro y satura el terreno que sostiene el muro creando un aumento o una subida en el nivel freático. Esa saturación crea una presión adicional a la del diseño del muro, que excede su resistencia por presión [hidrostática].

Esa presión [hidrostática] adicional es de tal magnitud que rompe el muro en tres lugares porque es súbita, uniforme y contra el muro hasta el nivel de tierra que sostiene. O sea, el agua sube, inunda, satura y empuja.[15]

[…]

La quebrada sube en su nivel. No tiene que estar lloviendo en Parkville. Es que las aguas y las escorrentías se captan en ese cuerpo de agua.

Sube el nivel de agua en la quebrada. Y eso crea que el nivel freático del terreno también suba porque es el pelo de agua. Es donde está el agua.

Rebasa el nivel donde hay drenajes en el muro particular que nos ocupa hoy. Y entra agua por la tubería de 12 pulgadas del sistema pluvial de nuestro condominio, el Condominio Parkville II.

Cuando eso sucede, se satura el agua -- se satura el terreno que está dentro de la propiedad. Esa presión de agua, debido al nivel de la quebrada, satura el terreno que está siendo retenido por el muro.

Al saturarse el terreno, crea la presión hidrostática que ya yo mencioné, empuja el muro y excede su resistencia de diseño y quiebra, rompe la pared en los lugares más vulnerables, que generalmente es donde hay algún cambio en dirección del muro.[16]

---

[15] Transcripción de la vista evidenciaria del 7 de noviembre de 2024, pág. 5; línea 9 a la pág. 48; línea 7.

[16] *Id.*, página 49; línea 22 a la pág. 50; línea 22.

Posteriormente, y ya con su informe en mano, en dicho turno, el ingeniero Mediavilla también testificó:

P       El título es, "Modelo de Recreación Activa en la Estructura Causada". ¿Nos puede explicar esa gráfica, por favor?

R       Bien. En la gráfica verán a la izquierda un modelo del muro vertical con una altura H. El caso que nos ocupa la distancia H es 18 pies, que es el muro de retención del condominio Villas de Parkville en la colindancia.

[…]

R       Y ahí el modelo indica una línea entrecortada horizontal donde dice, "*Ground water table*". Eso es el nivel freático.

Jueza:    ¿El normal?

R       No, déjeme explicar.

Jueza:    Okey.

R       Ese es el que sucede debido al evento. El nivel freático en el muro normal no existe ahí porque el nivel freático está al nivel de la quebrada normalmente, y la quebrada está más baja.

Normalmente, el pelo de agua normal de agua está más bajo que el muro. El muro está en una altura mayor a la quebrada. Y ahí comienza el muro.

La quebrada sube en su nivel y hace que el nivel freático aumente hacia arriba, hacia la superficie de la derecha del muro.

Y esa ese nivel freático crea una presión [hidrostática] que se refleja con las flechitas a la derecha, que ven en las gráficas de la derecha.

Esa presión [hidrostática] no fue -- el muro no fue diseñado para eso. ¿Por qué? Porque el nivel originalmente -- hubo un estudio de suelo donde el nivel freático era mucho más profundo y no creaba ningún problema al muro.

Nunca iba a llegar el nivel freático a afectar el muro, excepto cuando ocurre un evento extraordinario, "Act of God", como sucedió en el caso que nos ocupa donde la quebrada crece a tal nivel que hace que el nivel freático aumente, pero el muro no tiene la resistencia para esa presión adicional.[17]

[…]

Jueza:    ¿Y esos desagües de 12 pulgadas son tamaño normal?

R       De 12 pulgadas, eso es grandísimos, así, 12 pulgadas.

Jueza:    Okey.

---

[17] *Íd.*, pág. 57; línea 15 a la pág. 59; línea 18.

R          Esa es la salida de agua pluvial del terreno de Parkville.

Jueza:     Que es el que está aquí abajo, usted dice.

R          Que están por ahí, sí, señora, a ese nivel. Cuando sube la quebrada, no puede salir agua porque la presión de la quebrada es mayor que la que tiene dentro del terreno. El agua entra por esos tubos contraflujo.

Jueza:     Sí, y empieza a subir.

R          Y empieza a subir. Sí señora. Satura el terreno. Desarticula las tuberías porque empieza a saturarse el agua -- saturarse el terreno de agua. Inclusive, hay unos pocetos, que hay una foto que se ve el poceto.

           Dentro de la falla del terreno de la propiedad hay un poceto. Hay un registro. Ese tubo se desarticuló. El agua que viene de la quebrada entra, satura el terreno, empuja el muro, el muro rompe y se va todo ese terreno hacia afuera. Hubo una inundación por saturación del terreno.[18]

Por su parte, durante el contrainterrogatorio, el ingeniero Mediavilla

explicó:

P          Okey. Usted indicó que eso subió. Y quiero entender eso que me está explicando del mantenimiento de la tubería. Que eso subió y el agua entró.

R          El nivel de agua en la quebrada creció.

P          Creció, ajá.

R.         Al crecer, pues, amplía su campo de flujo.

P          Claro, claro.

R          Y sube al nivel que rebasa el cimiento del muro y la salida de los drenajes pluviales. Ese flujo tiene una fuerza hidrostática y trata de entrar, o sea, de desparramarse. Y lo que va a encontrar es una apertura con un tubo o varios de ellas y trata de entrar por ahí porque el flujo de la quebrada crecida -- su fuerza es mayor que la de cualquier agua saliendo por el tubo. Empuja hacia adentro y se introduce a través de cualquier lugar a través del muro. En el caso que nos ocupa, del tubo de drenar, de los tubos de drenaje porque son más redondos.

P          Claro.

R          Y eso hace que el agua empuja hacia ese lugar donde hay una apertura. Pero como es una crecida, también el nivel freático en el terreno nuestro sube también. Es como cuando sube y baja la marea. Igualito, sube o baja la marea.

           Y el nivel freático en nuestra propiedad también sube y baja con la crecida de la quebrada. Así que se va levantando el nivel del manto freático con la crecida

---

[18] *Íd.*, pág. 64; línea 7 a la pág. 65; línea 11.

paralelo y se mete por el tubo y sigue fluyendo hacia adentro además del nivel freático.[19]

[…]

P.    ¿Saturó el terreno?

R.    Saturó el terreno y crea una condición de presiones hidroestáticas laterales porque el agua, aunque el peso va hacia abajo, crea presión lateral.

P.    Okey. Quiero entender porque tengo una duda. Si está el muro y el agua empieza a subir, ¿eso está subiendo para los dos lados? Es lo que yo quiero entender, que el nivel freático es este de acá.

R.    Sube en un lado más que en el otro.

P.    Okey.

R.    ¿Por qué? Porque hay tuberías. Hay vanos o tuberías que te llevan a unos pocetos. Así que, si está entrando agua de afuera, está entrando todo lo que puede. Es como cuando abres una compuerta y empieza a subir agua o entrar agua a un lugar que está vacío y trata de subir.

Y como hay suelo, inclusive crece más, pudiese ir más, aunque el nivel del pelo de agua esté más bajito porque su fuerza hace que sube el agua. Está empujando. Es como una manga.

P.    ¿Pero es desde abajo?

R.    Desde abajo por las aperturas de los drenajes, además de--

P.    No, no. Okey. Okey.

R.    y además de que sube el nivel freático.[20]

[…]

P.    Mire, y yo le pregunto su opinión profesional. Si los tubos estuviesen desarticulados, eso sería una causa también de lo que usted habla de que sube el nivel porque ya no sube por abajo. Sube por abajo y por el lado.

R    Por abajo y por el lado.

P.    Okey.

R.    La causa es inundación en el sentido de saturación del suelo. No es que el tubo se haya roto o no; es que el agua ya está -- el terreno dentro del muro está completamente saturado por la condición del nivel que sube con la crecida y el nivel freático.

Así que si hubiera estado o no roto el tubo, no es la causa. La causa es la saturación y el aumento en el nivel freático.

---

[19] *Íd.*, pág. 113, línea 12 a la pág. 114, línea 20.
[20] *Íd.*, pág. 115, línea 8 a la pág. 116, línea 8.

O sea, el alza en el nivel freático que empuja al muro. El empuje del muro es lo que hace la falla.

P.       Okey. Mire, y yo le pregunto, usted dice que fue la inundación.

R.       La crecida del río.

P.       ¿Pero la crecida del río es una inundación?

R.       Crea una inundación desde el punto de vista de que satura el suelo como una inundación. Crea un cambio de presiones en el terreno debido al contenido de agua que hay en ese momento.

P.       Pero yo le pregunto, ¿qué es una inundación, usted como perito?

R.       Inundación es cuando hay una fuente o una condición de flujo de agua donde aumenta el volumen o la proporción de agua en un material de suelo, ya sea cubriéndolo o saturándolo. Eso es una inundación.

P.       ¿Eso es una inundación?

R.       Sí.

P.       Okey. Y la quebrada está ahí porque por ahí pasa el agua.

R.       No hay otra.

P.       No hay otra. Y entonces, cada vez que llueve, la quebrada inunda. Yo le pregunto.

R.       Crece en su cauce a razón o en proporción del flujo que recibe.

P.       ¿Pero las crecidas en el cauce de la quebrada son inundaciones?

R.       No son inundaciones a menos que vayan a tal nivel que rebasen o crean algún tipo de condición de suelos donde se satura el suelo o se inunda.

         O sea, su nivel se llena de agua como si fuese una piscina. O sea, se llena de agua y eso viene según la crecida y el volumen de la quebrada y su capacidad para que fluya agua.

P.       Okey. Okey. Mire, y yo le pregunto, y corríjame si estoy mal.

Jueza:   Espero, para yo entender. El hecho de que crezca la quebrada no quiere decir que se inunde la quebrada. ¿Son temas completamente diferentes?

R.       La quebrada lo que hace es que rebasa sus límites.

Jueza:   ¿Eso no quiere decir que se inunde?

R.       Eso significa que está inundándose, pero a la larga si rebasa sus límites inunda, o sea, acapara más allá de su cauce. En el caso que nos ocupa, el límite era el muro y

subió de tal manera que crea que se satura o suba el nivel freático dentro del terreno. Satura el terreno y es una inundación porque ya está creando una causa fuera de su límite que es el muro.

Jueza:      Okey.

R.      El límite es el muro en cuanto a la propiedad que nos ocupa. ¿Me expliqué?

Jueza:      Sí.

R.      Y para mí eso es una inundación porque se fue más allá de sus límites. Rebasó el límite donde hay controles. Eso es una inundación.[21]

Ahora, procedemos a reproducir las partes del testimonio del señor Olivencia más transcendentales a la controversia ante nos.

P.      Y si esa propiedad, cualquiera de estos eventos que están ahí, si esa hubiera sido la causa de la pérdida, ahora esta forma la excluye. ¿Hasta ahí?

R.      Hasta ahí.

P.      Entonces, usted hace el comentario en el párrafo final que dice, ¿qué?

R.      Es importante destacar que la póliza contiene otros endosos que modifican la cubierta provista con el efecto de ampliar la cubierta provista bajo la forma CP1030, "Causes of Loss Special Form". Los siguientes endosos tienen el propósito de restituir.

P.      Siga, "De restituir".

R.      "De restituir la cubierta por daños ocasionados por los eventos que Estaban originalmente excluidos en la póliza. Estos endosos que proveen cubierta adicional a la propiedad son el endoso CP1042, que es el que provee cubierta por daños ocasionados por peligro de terremoto y el endoso DF52, que es el que se conoce como "Flood and Tidal Wave Endorsement".

P.      Entonces, otra vez entramos en otra etapa donde la exclusión que de una forma estaba, ahora denuncia, o sea, ahora está cubierta nuevamente por estos eventos.

R.      Comprando sueños, en algunos casos.

P.      Y entre ellos está el "flood and tidal wave".

R.      Correcto.

P.      Por la DF52.

R.      Sí.

P.      Vamos a ver qué es lo que dice entonces la DF52.

---

[21] *Íd.*, pág. 117, línea 7 a la pág. 120, línea 16.

R.    ¿Leo? ¿Leo lo que está en pantalla?

P.    Sí.

R.    "In consideration of additional premiums and the provisions and situations herein and in the policy to which this endorsement is attached, including writers and endorsements thereon, the coverage of this policy is extended to include direct or indirect loss resulting from tidal wave or flood, howsoever caused".

P.    Cuando usted -- vamos a pararnos ahí un momentito. ¿Qué es lo que significa eso? ¿Qué es ahora lo que la DF52 me cubre? Que de no haberla tenido, hubiera estado excluida.

R.    Lo que pasa es que estamos entonces indicando que la compañía aseguradora está cobrando una prima adicional por incluir este endoso.

P.    ¿Y la cobró? ¿Cobró la prima adicional?

R.    Y la cobró porque está dentro de la prima, el total de la prima que le cobra por la póliza.

P.    ¿Ajá?

R.    Y por lo tanto, se cobró una prima adicional por incluir este endoso y que entonces este endoso provee cubierta; ¿verdad? La cubierta se extiende a cubrir daños directos o indirectos que sean como resultado de un "tidal wave", que puede ser un tsunami, lo llamamos ahora, o inundación "howsoever caused", cualquiera que fuese su causa.[22]

[…]

P.    Y le pregunto, ¿cuál es la definición que da de "tidal wave"?

R.    "Tidal wave is understood to mean the sudden rise of the sea and the attendant action of the waves accompanying such abnormal rise produced by or directly attributable to a meteorological or seismic disturbance".

P.    Basado en el testimonio que usted escuchó del ingeniero José Luis Mediavilla en el día de ayer, ¿aquí ocurrió un "tidal wave"?

R.    No.

P.    Vamos entonces a la próxima.

R.    "Flood is understood to mean inundation caused by the bursting of dams or retaining walls of lakes and reservoirs, or by rivers, canals, aqueducts and sewers or similar formations overflowing their banks, but excluding water pipes, mains or tanks in which water is normally contained".

---

[22] *Íd.*, pág. 106, línea 25 a la pág. 108, línea 17.

P.     Le pregunto si el evento como lo describió y la secuencia que el ingeniero Mediavilla dispuso en el día de ayer, ¿qué relación, si alguna, tiene esa definición de "flood"?

R.     Esta definición lo que está básicamente describiendo es lo que describió el ingeniero ayer, que cae bajo este segundo parámetro que vamos a leer.

P.     O sea, que el evento como lo describe el ingeniero Mediavilla fue un "flood".

R.     Es correcto.

P.     ¿Basándose en esa definición?

R.     Sí, porque él le indicó que la quebrada subió de su nivel natural y salió de su estado natural y vino a mojar.

P.     ¿Y provino de dónde?

R.     De la quebrada.

P.     ¿De una quebrada?

R.     Sí.[23]

[…]

P.     Vamos a ver entonces, basado en esos hallazgos, ¿verdad?, que usted pone en su informe, ¿cuál es el análisis al cual usted realiza sobre la pregunta última que está ante el Tribunal? ¿Qué esta póliza que usted cita y los endosos y las exclusiones y los renuncias a las exclusiones tienen en relación al evento como lo describió el ingeniero Mediavilla en el día de ayer? ¿Cuál es el análisis que usted hace?

R.     ¿Resumo lo que tengo escrito o leo la sección?

P.     Sí, claro, como usted requiera.

R.     Básicamente, analizando la póliza en cuestión y específicamente el endoso DF52, el endoso DF52 es un endoso opcional. La póliza del seguro es un contrato y los contratos pueden variar; ¿verdad?

No todas las pólizas cubren los mismos peligros o tienen los mismos endosos. Su estructura es similar, pero algunas pólizas contienen más cubiertas que otras. Este endoso de "flood" es un endoso que cualquier producto lo puede pedir, según sea su necesidad o su intención.

El "underwriter" está obligado a darlo. El "underwriter" lo da si entiende que cae bajo la guía de suscripción o que amerita ofrecerlo en ese momento. Así que se ofrece. Se incluye en la póliza. Se cobra una prima adicional. Y lo que se explicó ayer, que es lo que yo leí en el informe -- mi análisis está basado en el informe que preparó el ingeniero Mediavilla.

Y básicamente este endoso lo que hace es que provee cubierta porque el endoso lee que cubre pérdidas directas

---

[23] *Íd.*, pág. 108, línea 22 a pág. 109, línea 10.

o indirectas que resulten de un "tidal wave" o de una inundación, "howsoever caused", cualquiera que fuera su causa.

P.      Cualquiera que fuera su causa.

R.      Así es como lee el endoso. Pero básicamente lo que yo leí en el informe, lo que ayer él manifestó aquí, que vimos todos, es que precisamente hubo una inundación. La quebrada subió y la inundación provocó la fractura o el rompimiento del muro.

P.      Y eso es lo que significa "direct or indirect" y cualquiera que sea la causa que trajo esa agua.

R.      Correcto.[24]

[…]

P.      Y usando lo que usted obtuvo del informe del Ingeniero Mediavilla, ¿qué es lo que usted extrae de ahí en su análisis?

R.      Básicamente, como digo ahí, "Actualmente el informe pericial de daños en el muro de retención firmado por el ingeniero José Mediavilla confirmó que el muro se abrió y quebró en varios lugares durante la tarde del 17 de septiembre del 2022, mientras se registraban las fuertes lluvias asociadas al huracán Fiona.

"También certifica dicho informe que, debido a la crecida de la quebrada, la cual rebasó la elevación de descarga de la cabecera a lo largo de la colindancia Este con la presión hidrostática de la quebrada, creando un contraflujo, 'backflow'.

"Esto causó que la tubería de 12 pulgadas se reventara, provocando una inundación sobre el terreno. A su vez, y simultáneamente, estaba ocurriendo una saturación del suelo en el rehincho, 'backfill', del lado interior del muro de retención causado por el incremento del nivel freático.

"Estos eventos concurrentes con el nivel freático, 'ground water table', subiendo precipitadamente, crearon, en opinión del perito ingeniero, una presión activa por saturación del suelo hacia el muro de retención, resultando en cargas hidrostáticas laterales excesivas e insostenibles, superando la estructura del muro".

P.      Bien. Y basado en ese informe del ingeniero Mediavilla, ¿cuál es su opinión respecto a la cubierta de "flood" que hemos visto anteriormente?

R.      Que la causa del daño o del rompimiento del muro fue por inundación, que hay un endoso en la póliza, que la intención de ese endoso es proveer daño a la propiedad -- proveer cubierta en caso de que la propiedad tenga un daño directo o indirecto. En este caso fue directo por inundación.

---

[24] *Íd.*, pág. 110, línea 112 a la página 112, línea 18.

P. Y para Chubb, de acuerdo a lo que usted dice en el inciso cuatro, ¿Chubb acepta que fue el aumento de agua subterránea que causó el evento? ¿Correcto? ¿Es lo que usted dice en el inciso cuatro?

R. La calificación de Chubb hace referencia al informe del suelo en el cual se establece que la pérdida fue ocasionada por el aumento de las aguas subterráneas combinada con la erosión del suelo. Eso lee el informe de suelos y corrientes.

P. ¿Y usted dice en el inciso cinco qué?

R. Que según el portal de "Advancing Earth and Space Science", el aumento del agua subterránea es el movimiento hacia arriba del nivel freático debido a fluctuaciones de corto a largo plazo en la recarga de lluvia y/o niveles de ríos, océanos o mares.

P. ¿Y cómo compara esa expresión con el informe del ingeniero Mediavilla?

R. No contradice nada.

P. ¿Perdón?

R. No contradice nada, fue una inundación.[25]

[…]

P. Usted utiliza la palabra "enfatizar" en el inciso seis. ¿Qué usted nos quiere decir?

R. Que es importante resaltar que, aunque la forma "special form" contiene unas exclusiones, algunas de estas exclusiones se alteran o se eliminan porque se añaden unos endosos por los cuales se cobró una prima adicional, como por ejemplo, los dos endosos que hicimos referencia.

P. Que es el DF52.

R. El DF52, por ejemplo, el de inundación.

P. ¿Usted nos indica en el inciso siete qué?

R. Ah, perdón.

P. En el inciso siete.

R. Leo, "El concepto de causalidad anticoncurrente al cual el ajustador hace referencia no aplica para este evento".

P. ¿Usted se refiere a algún informe de declinación?

R. Sí, a la carta de declinación del ajustador de Chubb hace referencia a este concepto de causalidad anticoncurrente. Pero que yo digo que en este caso no aplica para este evento, pues, la aseguradora renunció a este concepto de causalidad anticoncurrente al incluir el endoso DF52. Porque el endoso DF52 contiene un lenguaje que entre otras cosas incluye o manifiesta e indica que este endoso

---

[25] *Íd.*, pág. 113, línea 10 a la pág. 115, línea 24.

tiene el propósito, y por el cual se cobró una prima adicional, tiene el propósito de cubrir pérdidas directas o indirectas que resulten de inundación.

P.     Inundación. Y le pregunto si, de nuevo, si por ese endoso particular DF52 el condominio pagó una prima adicional.

R.     Es correcto y el endoso lo establece. Este endoso conlleva una prima adicional.

P.     Y le pregunto si ese endoso DF52 no hubiera sido parte de esa póliza, ¿se hubiera cubierto este evento de "flood"?

R.     No.

P.     O sea, lo que hace la diferencia de cubrir o no cubrir es el DF52.

R.     El DF52.

P.     ¿Y usted dice en el inciso B qué?

R.     "Chubb eliminó la aplicabilidad del concepto de causalidad anticoncurrente al indicar que dicho endoso aplica a pérdida directa o indirecta, como resultado de inundación, cualquiera sea la causa de esta 'howsoever caused'. Esto es, el contrato establece que la póliza cubre cualquier daño sostenido por la propiedad asegurada como resultado de inundación, ya sea de forma directa o indirecta, a causa de un endoso".[26]

Por su parte, y con el propósito de contrarrestar la prueba presentada por el consejo, Chubb presentó el testimonio del señor Tilden, experto en pólizas de seguro. En lo concerniente, y con ese fin, a preguntas del abogado de Chubb este declaró, entre otras cosas, lo siguiente:

P.     -- en el segundo párrafo usted indica, "The endorsement Flood and Tidal Wave on the Declarations does not modify any exclusion or limitations as expressed by the policy".

       ¿Por qué usted indica eso?

R.     Algunos endosos reemplazan la exclusión, otros la modifican. Algunos hasta la borran. Estas incluyen -- estos endosos incluyen un lenguaje que es sugestivo. Este endoso no necesita tener ese lenguaje sugestivo.[27]

*[…]*

P.     Señor Tilden, le estoy presentando el endoso al que usted hace referencia. Por favor, lea la primera parte del endoso.

R.     "In consideration of additional premium and the provisions and stipulations herein, and in the policy to which this endorsement is attached, including riders and

---

[26] *Íd.*, pág. 117, línea 4 a la pág. 119, línea 7.
[27] Transcripción de la vista celebrada el 29 de julio de 2025, pág. 61, líneas 6-15.

endorsement thereon, the coverage of this policy is extended to include direct or indirect loss resulting from tidal wave or flood, however caused".

*[intervención de interprete]*

P.      Señor Tilden, ¿en dónde en ese endoso dice que se modifican las exclusiones de la póliza?

R.      Eso no lo dice.

P.      Señor Tilden, ¿en dónde en ese endoso indica que se enmiendan las exclusiones?

R.      No dice eso.

P.      Señor Tilden, ¿en dónde en ese endoso dice que se elimina el concepto de causalidad anticoncurrente?

*[intervención de intérprete]*

R.      No dice eso.

P.      ¿Qué efecto tiene este endoso en las exclusiones de la póliza?

R.      No afecta las exclusiones. Esto es una extensión de la cobertura.

P.      ¿Qué quiere decir que es una extensión de la cobertura?

R.      Una póliza de seguros tiene coberturas adicionales y extensiones de cobertura. Esta es una extensión de la cobertura.

P.      Señor Tilden, usted escuchó al distinguido señor Olivencia testificar que este endoso reemplazó las exclusiones relacionadas a agua, "water damages" -- "water exclusions". ¿Cuál es su opinión profesional sobre eso que testificó el distinguido señor Olivencia?

R.      Está incorrecto.

P.      ¿Por qué, señor Tilden?

R.      La exclusión por daños de agua es una exclusión de cuatro partes. Esto simplemente añade otra vez la inundación en el endoso.

*[reparo del abogado de Chubb a traducción]*

R.      Esto no elimina la exclusión, sino que añade otra vez el peligro de inundación a las cuatro partes de las exclusiones de daños por agua. Para estar claros, también añade los daños por tsunami, pero en este caso no estamos contemplando un tsunami.

P.      Señor Tilden, ¿qué definición de inundación, si alguna, este endoso establece como una causa no excluida?

R.    Dice que de ser causadas por el rompimiento de una represa o de un muro de contención relacionados a lagos o reservas de agua. Tiene el artículo –

*[intervención de intérprete]*

R.    "Esto utiliza el disyuntivo 'o' de ríos, canales, acueductos o alcantarillas o estructuras similares que sobrepasan sus límites o bancos.

Excluyendo tuberías de agua, tuberías principales o tanques donde el agua está normalmente contenida".[28]

*[…]*

P.    Cuando usted, como perito, hizo un análisis de esta controversia, ¿qué definición de inundación usted utilizó?

R.    La definición de inundación contenida en la póliza.

P.    Y yo le pregunto, al haber usted escuchado el testimonio del señor Olivencia y haber revisado su informe, ¿qué definición de inundación Olivencia utiliza para llegar a sus conclusiones de que hay cobertura?

R.    No estoy seguro, pero no es la definición contenida en la póliza.

P.    Señor Tilden, ¿en qué momento el ingeniero Mediavilla testificó que ocurrió una inundación conforme fue definido en la póliza?

R.    Él no lo hizo. Él dijo que el agua subió y bajó y movió su mano de esta manera.[29]

*[…]*

P.    Señor Tilden, durante todo este proceso en el que usted ha participado, ¿en qué momento alguien ha testificado que ocurrió una inundación conforme a los términos -- conforme a la definición de inundación que está en la póliza?

R.    Yo no escuché ese testimonio.[30]

*[…]*

P     ¿Y cuál es su opinión profesional cuando Oliven -- sobre el testimonio de Olivencia cuando Olivencia testificó que el endoso de inundación reemplazaba en su totalidad las exclusiones de "flood, surface water, waves, tides, tidal water, overflow", y demás que están en las exclusiones de la póliza?

*[intervención de intérprete y abogado de Chubb]*

R.    "No remueve esta exclusión, sino que extiende la exclusión" -- perdón, "extiende la cobertura según la póliza a 'flood' -- según la póliza de 'flood, surface water,

---

[28] *Íd.*, pág. 64, línea 16 a la pág. 66, línea 19 y pág. 67, línea 4 a la pág. 68, línea 2.
[29] *Íd.*, pág. 69, líneas 9-25.
[30] *Íd.*, pág. 70, líneas 5-11.

waves, including tidal waves, tsunamis, tides, tidal water', etcétera".[31]

Mientras tanto, durante el contrainterrogatorio que le fue realizado, el señor Tilden realizó las siguientes declaraciones:

P.       You said in your testimony, direct testimony, that you haven't seen a document in this case that establishes that the cause of the loss is related to the rising of waters of the creek adjacent to the condominium. Is that correct? [32]

R.       I testified that I heard testimony that the water rose.[33]

*[…]*

P.       The only witness that has testified in this court in regard to what caused the loss being claimed in this case is ingeniero Mediavilla. Is that correct?

R.       Sí.[34]

[…]

P       "During the atmospheric event which started on the afternoon of September 17, 2022, the rise in the creek, in the creek's water, overcame the elevation of the discharge from the foundation of the wall that ran along the east side". (traducción de pregunta)

Is that correct? That's what -- that's the opinion of Mr. Mediavilla, right?

R.       According to the translation, yes.[35]

[…]

P.       Has any witness have – testified contrary to that finding of Mediavilla?

*[intervención intérprete y abogado del Consejo]*

R.       No.[36]

[…]

P.       Okay. Has any witness refuted the expert opinion of Mediavilla as -- as you have read?

R.       No.[37]

[…]

---

[31] *Íd.*, pág. 72 líneas 5-14 y pág. 73, líneas 3-9.

[32] El idioma del testigo es el inglés. Durante el contrainterrogatorio, el abogado del Consejo realizó las preguntas en dicho idioma, por lo que, para efectos de esta sentencia transcribimos las preguntas y respuestas según fueron hechas y dadas, sin incluir la traducción dada por el intérprete.

[33] Transcripción de la vista celebrada el 30 de julio de 2025, pág. 39, líneas 9-21.

[34] *Íd.,* pág. 41, líneas 12-20.

[35] *Id.,* pág. 46, líneas 10-21.

[36] *Id.,* pág. 47, líneas 6-15.

[37] *Id.,* pág. 50, líneas 14-20.

P.      Clause G1 of special -- of the form, cause of loss, specifically excludes flood. Correct?

R.      Yes.

P.      And you just have said that that clause was amended by the endorsement of the Policy, of an -- by an endorsement of the policy. Is that correct?

R.      The clause was not amended, flood was amended as an extension.[38]

[…]

P.      P. On the first paragraph of that endorsement, it says that "the coverage of this policy is extended to include direct or indirect loss resulting from flood." Is that correct?

R.      Yes.

P.      And it also says that that coverage, which is extended by this endorsement for flood, it says "however, caused," correct?

R.      Sí.

P.      That endorsement was not written by the insured, correct?

        *[intervención de abogado del Consejo]*

P.      Correcto?

R.      Sí.

P.      ¿Sí?

R.      Sí.

P.      "Yes" means that it was not?

R.      That's correct.[39]

*[…]*

P       That third paragraph defines what flood is, correct?

R.      Sí

        *[intervención abogado del Consejo]*

P.      and it says—

P.      --"When caused, among other things, by rivers overflowing their banks." Is that correct?

        *[intervención abogado del Consejo]*

R.      Yes, among other things.[40]

---

[38] *Id.*, pág. 59, línea 15 a pág. 60, línea 6.
[39] *Id.*, pág. 61, línea 8 a pág. 62, línea 17.
[40] *Id.*, pág. 63, línea 5 a la pág. 64, línea 7.

Notamos que de las porciones transcritas surge que durante la vista evidenciaria, en favor de la reclamación instada por el Consejo bajo la póliza en controversia, el ingeniero Mediavilla declaró que, debido a las lluvias ocurridas durante el Huracán Fiona, la quebrada que colinda con el muro de contención de la propiedad del consejo creció. Igualmente, este testificó que la crecida de la quebrada ocasionó que el nivel freático[41] del terreno aumentara hacia arriba, hacia la superficie de la derecha del muro. El aumento del nivel freático, a su vez, creó una presión hidrostática en el muro y un contraflujo en sus desagües. Por sus propias palabras, la crecida del río creó una inundación, pues saturó el suelo como una inundación, creando cambio de presiones debido al contenido de agua que hay.

Por su parte, el señor Olivencia, apoyándose en el informe pericial preparado por el ingeniero Mediavilla, concluyó que lo que ocurrió por el paso del Huracán Fiona está comprendido dentro de la definición de inundación provista por la póliza. Ello así, pues según arrojó el informe pericial preparado por el ingeniero Mediavilla y lo declarado por él, la quebrada subió de su nivel natural, saturó el terreno al aumentar el nivel freático del mismo, lo que creó un aumento en la presión hidrostática hacia el muro de retención que superó la capacidad del muro. Basándose en ello, el señor Olivencia estableció en su testimonio que la causa del daño o rompimiento del muro fue por inundación y que dicha situación está comprendida dentro de la definición de inundación contenida en el endoso DF-52. Asimismo, declaró que el mencionado endoso, desplazó la aplicabilidad de causalidad anticoncurrente utilizada por Chubb para

---

[41] Nivel freático es el nivel superior de una superficie subterránea en la que el suelo o las rocas están permanentemente saturados de agua. El nivel freático separa la zona de agua subterránea que se encuentra debajo del de la superficie. El nivel freático fluctúa tanto con las estaciones como de un año a otro debido a las variaciones climáticas y a la cantidad de precipitación que absorbe la vegetación. También se ve afectado por la extracción excesiva de agua de los pozos o por su recarga artificial. *Véase*, Editores de Britannica. «Nivel freático». Enciclopedia Británica 26 de octubre de 2025, https://www.britannica.com/science/water-table.

denegar cubierta, pues este aplica a pérdida directa o indirecta que resulte de una inundación directa o indirecta cualquiera que sea la causa de esta.

Una evaluación de ambos testimonios nos lleva a concluir que, en efecto, el Consejo presentó evidencia suficiente para establecer que su reclamación está comprendida dentro de las disposiciones de la póliza expedida por Chubb, según la norma jurídica vigente le impone hacer. Entiéndase que, por las fuertes lluvias recibidas como consecuencia del Huracán Fiona, la quebrada que discurre adyacente al Condominio Villas de Parkville II creció, lo que a su vez causó un aumento del nivel freático del terreno saturándose el mismo a un nivel que ocasionó un contraflujo por los desagües del muro de contención creándose una presión hidrostática que la estructura no pudo resistir.

Aunque Chubb, como parte de los planteamientos en contra de la determinación de cubierta impugnada cuestiona la decisión del TPI de admitir al ingeniero Mediavilla como perito de ocurrencia y de opinión, no encontramos que el foro primario estuviera impedido de así hacer. Nuestra apreciación descansa en las expresiones hechas por nuestro Tribunal Supremo en *San Lorenzo Trad. Inc. v. Hernández*, 114 DPR 704, 713-714 (1983), a saber:

> "Cabe la posibilidad de que una persona acumule las cualidades de testigo y perito. Tan condición se configura cuando concurren las circunstancias fortuitas de un perito que presencia o participa en un hecho que subsiguientemente es total o parcialmente objeto de una contienda judicial. Nos hallamos [ante] una doble actividad probatoria de una misma persona: actividad testifical y actividad pericial. Una misma persona actúa como testigo y perito, a través del procedimiento de la prueba de testigos. […]" (citas omitidas)

Nos resta evaluar, entonces, si Chubb cumplió con la carga probatoria de demostrar la aplicación de alguna de las exclusiones acordadas en el contrato de seguro. Evaluado el testimonio del señor Tilden para dicho propósito, no quedamos convencidos que así ocurrió. Si bien es cierto que, como tribunal apelativo, en cuanto a la prueba pericial estamos en la misma posición que el foro primario y sobre esta podemos adoptar

nuestro propio criterio, coincidimos con la apreciación efectuada por el TPI de que su opinión carece de la base técnica e información necesaria para contradecir los hallazgos de los peritos del Consejo. Nada en la prueba señalada por Chubb en sus argumentos nos mueve a imponernos sobre la evaluación que el foro primario hizo de la prueba ante sí. Más aun cuando, según arriba citamos, las cláusulas de exclusión de una póliza deben interpretarse restrictivamente a favor del asegurado. Siendo ello así, y en consideración a lo antes expuestos, resolvemos que la determinación de cubierta efectuada por el TPI fue correcta.

Procedemos ahora a atender el restante de los señalamientos levantados por Chubb en los recursos consolidados. Así, en primer lugar, evaluamos si tal cual reclama como último error en su apelación, el foro primario se equivocó al no establecer parámetros para las vistas evidenciarias sobre cubierta a celebrarse en el caso. En cuanto a esto, Chubb señala que durante la vista celebrada el 24 de junio de 2024, el foro primario determinó que el caso se vería como uno ordinario en la modalidad fastrack. Destaca, que, durante dicha audiencia, el TPI no estableció que la vista a celebrarse se convertiría en una de causalidad que requiriera la contratación de peritos. En contrario, afirma que esta fue concebida únicamente para dirimir la controversia sobre las diversas cubiertas contenidas en la póliza, más no para adjudicar definitivamente la causalidad fáctica del siniestro. Así pues, señala que la sentencia parcial dictada en el caso resolvió la cobertura y la causalidad con una base probatoria incompleta, pese a que durante el trámite del caso el foro primario determinó que la controversia sobre fraude en la reclamación se atendería en etapas posteriores. También reclama que las controversias levantadas sobre fraude inciden en la determinación de cubierta, por lo que ha quedado en un estado de indefensión y desigualdad de condiciones.

Por su parte, el Consejo niega que Chubb se encontrara en un estado de indefensión, tal cual reclama la aseguradora. Particularmente, destaca que Chubb tuvo conocimiento del contenido del informe del ingeniero Mediavilla sobre causalidad desde la presentación de la *Demanda*, ya que el mismo fue incluido como anejo del documento. A su vez, establece que Chubb tuvo oportunidad, previo a las vistas señaladas, de deponer al ingeniero Mediavilla y presentar prueba pericial propia que controvirtiera un testimonio esencial para determinar la causa y cubierta, más no lo hizo. Por último, califica el planteamiento de la aseguradora como uno extremadamente tardío mediante el cual pretende subsanar su falta de diligencia procesal.

De la transcripción de la vista celebrada en el caso el 7 de noviembre de 2024, surge que la representación de Chubb reclamó que el ingeniero Mediavilla no era un perito conforme a las reglas. Esto, pues su testimonio estaba relacionado a todo el trabajo que realizó en el proceso de investigación y resolución de la reclamación. Por su parte, y dentro de la argumentación en contrario sometida por el abogado del Consejo, este señalo que la única persona que podía hablar de causalidad, de qué causó el quebrantamiento de la pantalla del muro de contención era precisamente el ingeniero Mediavilla, quien consignó las causas en el primer informe que preparó para el caso. Es más, afirmó que para con ese propósito era que el ingeniero testificaría.[42]

Chubb por su parte, señaló que, durante la audiencia del 24 de junio de 2024, se determinó que las vistas a celebrarse serían sobre la cubierta de la póliza y que quedaba pendiente de recibir del Consejo la documentación que se le había requerido como parte del descubrimiento de prueba. Al ripostar, el Consejo manifestó que los únicos documentos que se utilizarían

---

[42] Transcripción de vista celebrada el 7 de noviembre de 2024, pág. 13, líneas 8-13; pág. 15, líneas 1-24.

en cuanto al ingeniero Mediavilla eran los informes periciales que este preparó para el caso, los que la aseguradora tenía. Asimismo, planteó que era "necesario ese hecho de causa para entonces entrara en la materia de que basada en esa causa, basado en ese evento, basado en los hechos pericialmente determinados, si hay o no cubierta en la póliza de seguros."[43] Tras haber escuchado los distintos planteamientos levantados por las partes, entre los que se encuentra que el descubrimiento de prueba no ha finalizado, el Tribunal manifestó acoger o entender el planteamiento levantado por el Consejo en cuanto a que para poder determinar la cubierta debía saberse cuál era la causa que se está alegando por la cual se está negando la cubierta. Además, señaló que entendía que Chubb tuvo tiempo suficiente para contratar un perito de causalidad, por lo que se comenzaría la audiencia con el testimonio del ingeniero Mediavilla.[44]

Tras un análisis ponderado de las incidencias procesales del caso, así como de los argumentos levantados por ambas partes, no encontramos que el error señalado por Chubb se haya cometido. El foro primario entendió que para poder dirimir la cubierta era necesario entender cuál fue el evento y cómo y porqué ocurrió. Esta conclusión nos parece, además de razonable, lógica. Más cuando la razones por la que Chubb denegó cubierta descansaron en que: (1) el evento ocurrido fue un movimiento de tierra, causa de pérdida excluida de la cobertura; (2) el daño no fue causado por "vientos relacionados a tormenta, ni a un evento de inundación según definido por la póliza. Además de estas dos razones, al denegar la cubierta, Chubb señaló la existencia condiciones preexistentes.[45]

A juicio del foro primario, primero debía determinarse si había o no cubierta para entonces determinar si se cometió o no fraude en la

---

[43] *Íd.,* pág. 17, líneas 1-4 a la pág. 22, línea 13.
[44] *Íd.*, pág. 27, línea 20 a la pág. 28, línea 22.
[45] Véase carta del 28 de agosto de 2023, remitida por Chubb al Consejo en la que denegó cubierta. Anejo 12 de la Demanda. Entrada núm. 1, SUMAC TPI.

reclamación.[46] Más allá de presentar reclamos generales en los que alega que la falta de pautas específicas sobre las vistas evidenciarias a celebrarse en el caso le colocan en una posición de indefensión, Chubb no aporta argumentos concretos que nos convenzan de que así es. Por lo tanto, no intervendremos con tal determinación.

Atendidos ya todos los errores levantados por Chubb en su recurso de apelación **TA2025AP00600**, pasamos a evaluar los dos (2) formulados en el recurso **TA2025CE00816**. En ambos, Chubb cuestiona la concesión de las costas solicitadas por el Consejo en cuanto a los servicios prestados por sus peritos.

Para impugnar dicha determinación, Chubb primero argumenta que la aprobación de las costas es una prematura, pues en la *Sentencia Parcial* dictada en el caso no existe una parte victoriosa y una perdidosa como consecuencia de la adjudicación definitiva de las reclamaciones ante su consideración. Según Chubb, esto es contrario a la Regla 44.1 de Procedimiento Civil que supedita la concesión de costas a que exista una parte a cuyo favor se resolvió el caso; o sea a que haya un resultado final.

En segundo lugar, y con el mismo fin, Chubb asevera que las costas relativas al ingeniero Mediavilla son improcedentes pues este es un perito de ocurrencia sobre el cual no procede el pago de sus servicios y su labor durante el proceso de investigación, ajuste y resolución de la reclamación no constituyen costas recobrables y necesarias del trámite judicial.

En su oposición, el Consejo reclama que la *Sentencia Parcial* resolvió definitivamente el asunto de la cubierta por lo que sí procede la concesión de las costas. Además, señala que el foro primario encontró que la actuación de Chubb de litigar el asunto de la cubierta fue temeraria por lo que también proceden.

---

[46] Véase *Orden* del 18 de octubre de 2024. Entrada Núm. 47, SUMAC TPI.

La decisión impugnada por Chubb en su recurso de *certiorari* es una de naturaleza interlocutoria regida por la Regla 52.1 de Procedimiento Civil, *supra,* y la Regla 40 de nuestro Reglamento, *supra.* Evaluados los argumentos que levanta en el mismo, no encontramos razón alguna por lo que intervenir con esta, por lo que, según adelantamos, denegamos la expedición del recurso de *certiorari* TA2025CE00816.

IV.

Por las razones antes esbozadas, **denegamos** expedir el recurso de *certiorari* **TA2025CE00816.** De otra parte, confirmamos la *Sentencia Parcial* apelada a través del recurso de apelación número **TA2025AP00600**.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones